## WASHINGTON FORD v. JAMES SURGET.

1. WAR BETWEEN CONFEDERATE STATES AND UNITED STATES — PERSONS WHO DESTROYED COTTON UNDER MILITARY ORDER NOT LIABLE. — Where cotton was destroyed during the late war between the Confederate States and United States, by order of the provost marshal of Adams county, who acted in obedience to orders of the Confederate general commanding the department in which that county was situated :   Held, that the agent of such destruction is not liable in an action by the owner of the cotton.

2. SAME — LAWFUL BELLIGERENT ACT TO DESTROY COTTON UNDER SOME CIRCUMSTANCES. — It was a lawful belligerent act, during the late war, in certain circumstances, under the authority of the Confederate States to destroy cotton.

3. SAME — SAME — WHAT NECESSARY TO RELIEVE AGAINST RESPONSIBILITY IN SUCH CASE. — To relieve the party engaged in it from civil responsibility to the owner, he must have been in such relation to the Confederate belligerent, as to give the act the character of belligerency and hostility.   His conduct must have been guided and prompted by military authority.

4. CONFEDERATE STATES HAD NO RIGHTS OF SOVEREIGNTY — IT WAS NOT A DE FACTO GOVERNMENT — ITS LEGISLATION A NULLITY. — No rights of sovereignty pertained to the Confederate States.   As to the United States the Confederate States was an usurpation.   It was not a de facto government.   Its legislation was a nullity, having no effect or validity in law.

5. CONFEDERATE STATES HAD BELLIGERENT RIGHTS.—The Confederate States had the rights of a belligerent power.

6. LEGITIMATE BELLIGERENT RIGHTS TO DESTROY PRIVATE PROPERTY TO SAVE IT FROM THE ENEMY. — It is a legitimate belligerent right to destroy whatever private property is the subject of seizure and condemnation, in order to prevent its coming into the use of the enemy.

ERROR to the circuit court of Adams county.   SMILEY, J.

The facts of this case distinctly appear in the opinion of the court.   Although there was no bill of exceptions, and the errors assigned were alleged to arise out of the action of the circuit court on the pleadings, this court considered and decided the case upon the principles of law involved

in the substance of the pleadings, without reference to their structure, and any further statement of the case than is contained in the arguments of counsel and the opinion of the court is deemed to be unnecessary.

*W. & J. R. Yerger*, for plaintiff in error.

The special pleas filed by the defendant in this case constitute no defense whatever to the plaintiff's action.

The United States authorities have uniformly and persistently refused to recognize the government of the Confederate States or even the government of the states in rebellion as governments *de facto*. It was recognized as a belligerent, and as such the rights and duties of a belligerent were accorded to it. In the case of the United States v. Kelsler, 9 Wall. 83, the court uses this language: "The whole Confederate power must be regarded by us as a usurpation of unlawful authority, incapable of passing any valid laws, and certainly incapable of divesting, by an act of its congress or an order of one of its departments, any right or property of the United States. Whatever weight may be given under some circumstances to its acts of force, or on the ground of irresistible power, or whatever effect may be allowed in proper cases to the legislation of the states while in insurrection, are questions which we propose to discuss only when they arise. The acts of the Confederate congress can have no force or law in divesting or transferring rights, or an authority for an act opposed to the just authority of the federal government." See, also, Hickman v. Jones, 9 Wall. 197, where this doctrine is more distinctly and clearly stated, and also that belligerent rights were never extended to the pretended government of the confederacy, but only to the belligerent in arms. This case determines the question very clearly that the law of the Confederate congress, authorizing or directing the burning of cotton, in certain cases, had no authority as a law under which the defendant can justify his action destroying the cotton of plaintiff. Nor does the

order of the provost marshal at Natchez, issued under the directions of Gen. Beauregard, make any more valid defense for the conduct of defendant.

The plea does not aver that the defendant was a soldier in the Confederate army, or subject to the military control and direction of the provost marshal, or Gen. Beauregard, or subject to punishment for disobedience to their orders, and should it be conceded that an order by a military superior to his inferior, or to a soldier under his command, might justify or excuse the destruction of the private property of a third person, destroyed in obedience to such order, yet it is very clear that such order will not justify or excuse a third party, not a soldier nor amenable to military authority, for a trespass upon the person or property of another.   See Smith v. Stuart, 21 La. Ann. 67; Law Review for October, 1870; Echols v. Stanton, 3 W. Va. 574. If it were conceded that fear of personal danger or over-powering force might absolve him from liability, yet the plea does not aver or set forth that the acts were done under such circumstances as on these grounds would excuse.

But it is not admitted that fear of personal violence or injury apprehended will justify or absolve from liability for wrongs or injuries done to the property of another.   It is true that the fear of personal injury, where the danger is imminent and impending, will excuse a party from punishment for the commission of an act which would otherwise be criminal; but there is no rule of law which excuses or absolves a party from making compensation to another for the destruction or injury of his property.   Where such destruction or injury has taken place, in order to protect one's own property or person from serious or irreparable injury, no blame or crime will be imputed to a party who, under the apprehension of serious and immediate danger to his own person and for the purpose of protecting himself against it, uses or destroys the property of another; but, at the same time, as he has used for his own protection that which did not belong to him, and converted or destroyed

the property of another, there is no reason in law or morals that he should not compensate for what he has destroyed, or pay for what he has used. A starving man may take your food to save his own life. A sick man may seize the drug which will restore him to health and arrest the progress of a mortal distemper if he cannot otherwise procure it; but, in either case, he must make compensation to the owner. So, to save one's self from freezing to death, you may burn the fence of another, but you must pay for it; and it may be true that the defendant feared that he would be subjected to personal injury or violence, or to pecuniary loss or to public obloquy if he did not obey the order of the provost marshal in this case, but he was under no legal obligation to obey the order, no duty required him to do so, and no law rendered it imperative upon him; and if, to protect himself or his property from violence or apprehended violence, he destroyed the cotton of plaintiff, while we impute no blame or moral turpitude for the act and excuse him from punishment for crime, there is no law, either moral or social, statutory or common, which will exonerate him from paying the just value of the property of another which he used to protect himself.

The declaration charges against the defendant a grievous wrong that he would not have consented to commit under any ordinary circumstances. For justification, he pleads that the act was done in aid of the rebellion against the United States; and thus his plea admits the cause of action. He pleads the authority of an alleged government persistently ignored by the United States, and asserts the orders of persons whose alleged commissions were not issued by any authority, whatever. Like the ordinances of secession, they were illegal and null. Again, it is urged in argument, in his behalf, that the act was done by direction of one acting as an officer in a host of belligerents, but it is not pretended that defendant was a soldier, nor in any way constrained, save by zeal in aid of rebellion, to do the wrong. Nor is it pretended that he was in any sense loyal or unwilling. It

is said there was an actual government of force, in these southern states, to which defendant owed duty and obedience ; but the settled rule is, that obedience to such a wrongful domination may not extend to acts of hostility against the rightful government, while it may be excusable if limited to submission in matters of civil life. 8 Wall. 9, 10, 11. Such a government may have its courts and other formal civil institutions, supported by force. Ib. 9. But those apparent courts cannot try persons for alleged acts of hostility to such a government (9 ib. 200), and such seeming courts are in law, "nullities." Ib. 201. It is not in law a government, but a mere illegal domination, made potent by the multitude banded together for an illegal purpose, and can never be regarded as the source of authority. Its apparent orders may serve for excuses only in some matters ; but never where the thing done or attempted is in hostility to the rightful government. 8 Wall. 9, 11. For this reason the sale of the Texas bonds was inoperative, although they were in actual possession of the insurgent belligerents and were actually delivered over to the purchaser. Texas v. White. For this reason, the seizure and trial of a citizen for treason, as a friend of the United States, was held illegal and a trespass. 9 ib. 200. And on the same ground, a debtor of the United States was held liable, after full payment made under "Confederate authority." United States v. Kuhler, 9 ib. 33.

It is vain to claim that the magnitude of the controversy of armies, of itself, changed the legal character of the strife, or converted acts of treason into legitimate warfare. 9 Wall. 200. Alike vain is it, to attempt justification under any claim of "belligerent rights." All that matter was dependent on the grace of the United States, and carefully limited to the customary treatment of prisoners of war ; while, during all the time, the law denounced the Confederate "belligerents" as simply "rebels, enemies and traitors." 2 Black, 669 ; Halleck's Int. Law, 344, 345 ; 2 Wall. 420. Every act, legislative or otherwise, done in the name of a state located in this "enemy's territory," has been held ille-

gal and void, if done "in aid of the rebellion." Thomas v. Taylor, 42 Miss. Every act of attempted seizure, or confiscation, done by the Confederate "belligerent," has been held inoperative and void. If acts done by or under authority of this "belligerent" were valid, why were not the seizure and sale of the Texas bonds, and the seizure of the post-office funds, and the seizure for treason, sanctioned by the federal courts? If the argument for defendant be correct in law, all those decisions are erroneous. The fact is, that "martial law" has not, within this union, subverted the good old laws, constitutional and common, as gentlemen assume. See the case *Ex parte* Milligan. The Tennessee decisions, relied on by counsel, rest on the erroneous assumption that the Confederate government existed, and that its warrant was a justification of a like character is the fallacy touching the alleged "full belligerent rights" of the Confederates. It is to be further noted, that the act complained of was done within the lines of actual military occupation held by the Confederates, and that, although done in aid of the rebellion, it was also a wrong to the property of the plaintiff. It is vain to claim from any act of the United States, an authority or excuse for this private wrong. The government might have waived prosecutions for all offenses against itself, and yet, such waiver would not preclude recovery for private injuries. The pleas do not charge complicity in the rebellion, against the plaintiff, nor would such a charge be relevant to the case. 9 Wall. 202, 203. Upon the general questions involved, see, in addition to cases cited, 2 W. Va. 192, 306; 4 ib. 138, 170, 173, 176, 356, 420.

The case cited from 10 Wall. 480 is not relevant. It involved the construction of the acts of congress in relation to sales and transfers by southern citizens during the war, which enactments were intended to prevent conveyance made to defeat proceedings for confiscation. If the opinion in 8 Wall. can be construed as counsel read it, the same court corrected the error in 9 Wall. 200, 201.

We invite special attention to the very able decision of the points in this case made by the court of West Virginia. It is full of conclusive argument against the propositions of counsel. 2 W. Va. 192.

It is vain to argue that Provost Farrar "made soldiers" of the persons to whom his advertisement was directed. It was addressed "To the citizens of Adams county."

*Winchester & North,* for defendant in error.

The logic of the late war has demonstrated what the commentators on the constitution, statesmen and jurists, did not seem before to understand, that the constitution of the United States has within itself provided for two separate and distinct governments, the one to rule in the time of peace, the other in the time of war; each sovereign and supreme in their separate spheres.

The declaration of martial law supersedes and subordinates the civil, and substitutes military rule over a particular district not of the country, while the declaration of a public war subordinates the whole territory and all its inhabitants to military rule, and the law of peace is suspended. Halleck on Int. Law, 371, §§ 24, 25, 26, 27, 28.

A second question, also, which seems not to have been properly understood before, has been conclusively settled by the late war, viz., that a war can legally be commenced and carried on by the military authority and government of the United States, as provided for in the constitution, without a previous act of congress to sustain it. The constitution has carefully provided that the military rule shall not step in and assume the absolute sway over the country unless by the will of the society itself being first ascertained. Therefore, when a war originates with and flows from the will of the government, an act of congress is required in order to identify it with the will of the people. But, where a war arises from the will of the people themselves, no such act is required. It is the people themselves who invite military rule. Prize Cas., 2 Black, 666.

The late war was commenced and conducted on the part of the United States upon these two principles, and all the decisions of the United States supreme court, rendered upon the conduct of the war, have fully sustained them.

It is true that many of the decisions of the state and local courts seem to conflict with these views; but it is evident they do not understand the principles upon which the late war is fully justified by the supreme court of the United States, viz. : that the constitution has provided a rule of government for the people in time of peace and another for war, each distinct and supreme in their separate spheres.

. Justice Greer, in the prize cases, after showing that a war may arise from the will of the society itself, and when it becomes of such proportions as to interrupt "the regular course of justice" it requires no act of " congress to baptise it with a name," says : " By the constitution congress alone has the power to declare a national or foreign war. He cannot declare war against a state or any number of states by virtue of any clause in the constitution."   Again, " he (the president) has no power to initiate or declare a war either against a foreign nation or a domestic state."   2 Black, 666.   This case justifies the president in the course he pursued upon the ground : 1st. That the war originated with the people themselves, and not with or by the government; and 2d. That the civil rule, as provided for in the constitution, had been suspended by the act of war, and it became necessary for the president to resort to the war power vested in him.

The declaration of war then was a proclamation of martial law, subordinating civil to military rule, in all the states not in rebellion.   How far the military power could suspend the civil law in different localities would depend upon the state and condition of the district.   If the district be in a state of siege, the civil law is suspended altogether, but, under almost any other condition, the civil acts in concert with, but in subordination to, the military.   See Halleck on Law, 374, § 26, title Martial Law.

The pleas show that the place, Adams county, at the time of the alleged burning, was in a state of siege, or about to be invaded and about to fall into the possession of the enemy. What was the duty of the inhabitants of that district under the circumstances? International law writers tell us what that duty is in public wars. "Every member of a society is obliged to serve and defend the state as far as he is capable." Vattel, book III, ch. 2, § 8. "No person is naturally exempt from taking up arms in defense of the state." Ib. § 10. "In the declaration of war the ancient form is still retained by which all the subjects are ordered, not only to break off all intercourse with the enemy, but to attack them. Custom interprets this general order. It actually authorizes, nay even obliges, all subjects, of whatever rank, to seize the persons and things belonging to the enemy, when they fall into their hands, but does not invite them to undertake any offensive expeditions without a commission or particular order. Vattel, book III, ch. 15, §§ 223, 227.

Halleck, after stating the general rule that "every citizen is bound to serve and defend the state of which he is a member as far as he is capable," shows that many persons are now excused from military service, and these are accounted non-combatants, and should not engage in offensive hostilities. "Nevertheless, it often happens, in case of invasions and in the siege of fortified towns, that not only merchants, mechanics and the common peasantry, but also the clergy, magistrates, old men, women and even children take up arms and render good service in the common defense. In doing this they lose the character of non-combatants and become subject to the ordinary rules of war. Those who lay aside their peaceful avocations, and engage, either directly or indirectly, in hostile acts toward the enemy, whether by the orders of their government or their own free will, are liable to the consequences which lawfully result from such acts, but to none other. Halleck on Mil. Law, 383, § 3.

"Although a state of war puts all the subjects of one nation in a state of hostility with those of the other, yet, by

the customary laws of Europe, every individual is not allowed to fall upon the enemy. If subjects confine themselves to simple defense, they are to be considered as acting under the personal order of the state, and are entitled to be treated by the adversary as lawful enemies, and the captures which they make in such a case are allowed to be lawful prizes. But they cannot engage in offensive hostilities without the express permission of the sovereign. 1 Kent's Com. 94, 96. The above maxims govern in public or national wars, and Vattel says they "ought to be observed by both parties in every civil war."

"The laws of war as established among nations have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war. Hence the parties to a civil war usually concede to each other belligerent rights." Prize Cases, 2 Black. 667. The same is asserted by that court in the cases of Mrs. Alexander, 2 Wall. ; Thorington v. Smith, 7 ib. 554.

In Thorington v. Smith, the chief justice says : "To the extent, then, of actual supremacy, however unlawfully gained, in all matters of government within its military lines, the power of the insurgent government cannot be questioned. That supremacy did not justify acts of hostility to the United States. How far it should excuse them must be left to the lawful government upon the re-establishment of its authority. But it made obedience to its authority in civil and local matters, not only as a necessity but as a duty ; without such obedience civil order was impossible." The case before the court was a transaction of a private character, between individuals, who were non-com batants, and while the court holds that non-combatants must necessarily obey that authority in civil and local matters, yet it will not justify acts of hostility on their part to the United States. The distinction between acts of hostility done by persons in obedience to military orders and mere civilians, who are bound to obey in "civil and local matters" only, is plainly drawn, the former may justify and the

latter not. The cases cited in 9 Wallace, by plaintiff's counsel, are cases where the parties attempt to justify their acts of hostility under the civil and not the military government of the Confederate States of America.

If plaintiff in that case had been arrested by the military authorities and tried by court martial, the case would have been different. Is there any doubt that the court would have justified the act of the officer making the arrest, as well as the officers composing the court martial? The belligerent rights conceded to the Confederate States of America cannot be confined to the mere exchange of prisoners of war, and their lives be prolonged to the end of the war, when they should be punished as traitors and hung.

The question in the Prize Case was one of belligerent rights over property of the enemy. So in Mrs. Alexander's Case. All the authorities in the United States supreme court, upon the subject of the late civil commotion, draw the distinction between acts of hostility, done by individuals in obedience to the orders of the military authorities, while they were recognized as belligerents, and acts done either before the recognition or during the recognition, but without orders, or since. The former were imputed to the government, for which the individuals are not liable, either criminally or in private suit. Acts of the latter description the individuals are personally liable for, either at the suit of the government for crime or of private persons in suit for damages. The decisions of the state courts to the contary are not law.

*W. T. Martin*, on the same side.

If we consider the conduct of the Confederate government and the United States government in relation to the article, cotton, during the late war, we will discover that it possessed, in the opinion of the belligerents, peculiar importance. It was the subject of express legislation by the congress of each belligerent. It was treated by the officers of each army, navy and government, not as other property, but as

possessing extraordinary qualities and power, and to be treated, even in the hands of non-combatant individuals, as different from ordinary private property.   It formed the basis of the credit which the Confederate government was laboring to establish in Europe.   Its retention in the southern states, and withdrawal from market, except when used by the Confederate government for war purposes, was considered of vital importance ; for it was hoped that its withdrawal from foreign markets would compel a recognition of the independence of the states in rebellion, and a raising of the blockade, which was destroying the resources of the Confederates and crippling their armies.   Its destruction or retention in the south was operating injuriously to the northern states, by injuring their manufacturers, and thus weakening their resources.   The congress of the Confederate States, prior to the burning of the cotton in question, had directed by law that the cotton, sugar and tobacco, liable to fall into the hands of the federal army or navy, should everywhere be destroyed, and it is matter of history that millions of dollars' worth of these articles was destroyed in consequence of this act and of orders from that government.

How was cotton treated and regarded by the federal government?   In the Alexander cotton case, the chief justice points out precisely how the federal government would dispose of cotton found in the hands of a resident of a state in rebellion.   In treating of the rule which, in general, exempts from seizure in war private property not used in warfare, he says : "It may now be regarded as substantially restricted, in special cases, dictated by the necessary operation of the war," and as excluding in general "the seizure of the private property of pacific persons for the sake of gain," and cites 1 Kent, 92, 93.  2 Wall. 419. And while recognizing this humane rule, the chief justice proceeds to decide in the case referred to, in which cotton was the subject of litigation : "The capture seems to have been justified by the peculiar character of the property, and by legislation.   It is well known that cotton has con-

stituted the chief reliance of the rebels. for means to purchase the munitions of war in Europe. It is matter of history that, rather than permit it to come into possession of the national troops, the rebel government has everywhere devoted it, however owned, to destruction." 2 Wall. 420.

So then, the supreme court of the United States affixed a peculiar character to cotton during the war, and recognized the character accorded to it by the rebel government. It was treated by both belligerents rather as contraband of war, as having lost its character as private property merely, but as having become the subject of especial governmental action and control, whether for preservation, seizure, confiscation or destruction.

Who were the parties, the owner and the destroyer of the cotton in question, at the time of its destruction in 1862 ?

A war was then in progress between certain states styling themselves the Confederate States and the general government. Foreign governments had recognized the belligerent character of the people in rebellion. The United States government had, by its acts, done the same thing. A blockade had been established ; the exchange of prisoners made ; large armies were in the field contending with varied success ; the state of Mississippi had undertaken to sever her connection with the general government ; a Confederate government was in full vigor with all the appropriate forms, officers and characteristics of a government ; Ford and Surget were citizens resident in Mississippi. They were alike held, according to well-known principles, to own allegiance to the power or government then holding the territory where they resided. Its orders they could not evade ; they did not attempt to evade them.

By the rules of law now indisputable, they were enemies for the time of the general government. So, in the Alexander cotton case, the chief justice decides them to have been. He says : "We must be governed by the principle of public law, so often announced from this bench, as applicable alike to civil and international wars, that all the

people of each state or district in insurrection against the United States must be regarded as enemies until, by action of the legislature and the executive or otherwise, the relation is thoroughly and permanently changed." 2 Wall. 419.

On page 488 of the same case (Alexander's) the court further decides as to Mrs. Alexander's cotton : " There can be no doubt, we think, that it was enemy's property.   The military occupation by the national military forces was too limited, too imperfect, too brief and too precarious to change the enemy relation created for the country and its inhabitants by three years of continuous rebellion ; interrupted, at last, for a few weeks, but immediately renewed and ever since maintained."

In the prize cases decided in December, 1862, upon captures which were made in 1861, the court says : " Insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the government. A civil war is never solemnly declared, it becomes such by its accidents, the number, power and organization of the persons who originate and carry it on.   When the party in rebellion occupy and hold, in a hostile manner, a certain portion of territory, have declared their independence, have cast off their allegiance, have organized armies, have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest as war."   2 Black, 666, 667.   In the same case, after referring to the recognition of the belligerent character of the people in rebellion by Great Britain, the court farther say : "After such an official recognition by the sovereign, a citizen of a foreign state is estopped to deny the existence of a war, with all its consequences as regards neutrals.   They cannot ask a court to affect a technical ignorance of the existence of a war which all the world acknowledges to be the greatest civil war known in the history of the human race, and thus cripple the arm of the government and paralyze its power by subtle definitions and ingenious

sophisms." Prize Cases, 2 Black. 669, 670. And again, in the same cases, pages 673 and 674, the court say of the rebellion : "It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force. South of this line is enemies' territory, because it is claimed and held in possession by an organized, hostile, belligerent power." In a late case, not yet reported, of Thorington v. Smith, Chief Justice Chase, laboring very diligently to avoid calling the Confederate government a "*de facto*" government, yet doing it, and indulging in some wire-drawn distinctions on the subject, says that a "*de facto*" government exists "when the usurping government expels the regular authorities from their customary seats and functions, and establishes itself in their place, and so becomes the actual government of a country ; " and again, of another sort of "*de facto*" government, which he seemed to think the Confederate government to have been : "Its distinguishing characteristics are, first, that its existence is maintained by active military power within the territories, against the rightful authority of an established and lawful government; and, second, that while it exists, it must necessarily be obeyed in civil" (why civil only ?) "matters by private citizens, who, by acts of obedience, rendered in submission to such force, do not become responsible as wrong-doers for these acts, though not warranted by the laws of the rightful government." He refers to the case of Castine, 4 Wheat. 253, and of Tampico, 9 How. 614.

In the same case occurs the following in regard to the Confederate government: "The whole territory governed by it was thereafter (*i. e.*, after the war began) held to be enemy's territory, and the inhabitants of that territory were held, in most respects, as enemies. To the extent then of actual supremacy, however unlawfully gained, in all matters of government within its military lines, the power of the insurgent government cannot be questioned. That

supremacy would not justify acts of hostility to the United States.    How far it should excuse them must be left to the lawful government upon the re-establishment of its authority."

Then at the time of the burning of Ford's cotton, a war was in progress.    He and Surget alike were to be treated and regarded for the time being as subjects of the Confederate government, alike in rebellion, alike having risked property and life in the cause of the rebellion.    Now, from the authorities cited, it is clear that a war existed; that, except so far as questions might arise as between the regular national government of the United States and the persons engaged in rebellion, the people of the states in insurrection must be held, as between themselves, and between the Confederate government and themselves, to have been, with their persons and property, under the control and authority of the insurrectionary government.

That government had, for the time, absolute and sovereign control over them; a right by the law of nations to enforce obedience and to punish failures to obey.    But, "when war is duly declared, it is not merely a war between this and the adverse government in their political characters. Every man is, in judgment of law, a party to the acts of his own government, and a war between the government of two nations is a war between all the individuals of the one and of all the individuals of which the other nation is composed."    1 Kent, 63.    "Although a state of war puts all the subjects of the one nation in a state of hostility with those of the other, yet, by the customary law of Europe, every individual is not allowed to fall upon the enemy.    If subjects confine themselves to simple defense, they are to be considered as acting under the presumed order of the state."    "But they cannot engage in offensive hostilities." Ib. 102.

Ford, as to the destruction of this cotton, was "a party to the acts of his own government."    He cannot question them now.    If the rebellion had been successful he might

have claimed recompense for property destroyed to keep it from benefiting the enemy, and his government, thus successful by law, would have been liable to recompense him; but not the instrument, not the individual used by his government, could have been held responsible for obeying the orders of their common government. Ford, Surget and thousands of others engage in rebellion and form an insurrectionary government and recognize its authority; the whole scheme fails, and Ford asks that Surget may be compelled to pay him for the losses he has sustained in the rebellion in which they were participants. Will a court now interfere for such an unreasonable and unjust purpose? See Vattel (ed. of 1855), 402, § 232.

Surget does not claim to have been in the military service of the Confederate government; but then he engaged in no offensive acts of war. His act was only defensive. Besides, to him directly through the regular channels, came the order of the government to destroy Ford's cotton as well as his own. He is innocent and should be held harmless. Vattel properly lays down the law that should govern, in considering the liability of Surget, as follows: "On all occasions susceptible of doubt, the whole nation, the individuals and especially the military, are to submit their judgment to those who hold the reins of government — to the sovereign; this they are bound to do by the essential principles of political society and of government. What would be the consequences if, at every step of the sovereign, the subjects were at liberty to weigh the justice of his reasons and refuse to march to a war which might to them appear unjust? It often happens that prudence will not permit a sovereign to disclose all his reasons. It is the duty of subjects to suppose them just and wise until clear and absolute evidence tells them the contrary. When, therefore, under the impression of such an idea, they have lent their assistance in a war which is afterward found to be unjust, the sovereign alone is guilty. He alone is bound to repair the injuries; the subjects, and particularly the military, are innocent.

They have acted only from a necessary obedience." Vattel, p 380, § 187.

As to Ford and Surget, who was, in 1862, the sovereign, as between themselves and the rebel government? Why, the people of the insurrectionary states, of which both appellant and appellee were units, represented by the rebel officers. Will this court hold that Surget should have disobeyed his orders? He was specially ordered to do a certain act, by the officers of the government in rebellion, carrying out the policy of that government, destroying cotton to prevent it from falling into the enemy's hands. *Quoad hoc,* he was a soldier. He was bound to obey and could not have resisted. There was no one, no government *de jure* to protect him from the consequences. What inhumanity it would be, under such circumstances, to require him to disobey. Let it be remembered that no question arises as to the character of Surget's act, in view of the claims of the government *de jure* upon him. It is a question between individuals as to who shall bear the loss of a common attempt to throw off allegiance to the United States government. Shall the courts protect the property of one rebel to the detriment of another, and undertake to fasten upon one the consequences of obedience to the potential government which claimed and exercised, by common consent of the governed, full sovereign power over life, limb and property?

Does the failure of the insurrection or rebellion change the principles which should govern this case? If it had been successful Surget would not have been liable to Ford. Why should he be now? The government of the United States is not asking for punishment in this case. A disappointed rebel is. The Alexander Cotton case fixes his status. He could not divest himself of the character which the laws of war gave him when the war began. Both governments held him to this. Both governments held Surget to the same status while the war lasted.

The supreme court of the United States in the Peterhoff

case decide, "that persons residing in the rebel states, at any time during the civil war, must be considered as enemies during such residence, without regard to their personal sentiments or dispositions." 5 Wall. 60, and cases above cited. Why is this so? Can any other reason be conceived than that by the law of nations the resident of a country at war is bound to obey the laws of the government under which he resides, irrespective of his sentiments, and is subject at all times to be called upon to make war for that government? Can any other reason be assigned for the rule? It is important in its character. It is ancient and well established, and this upon the ground that the belligerent government was able and had a right to compel the services of residents, and to cripple the arm of its adversary, each belligerent must needs act upon this rule.

Nor does the law ever undertake to punish by damages awarded to individual suitors, acts that are done by reason not of willfullness, wantonness, malice or neglect? Here an overpowering necessity, a present irresistible force, that is, a strong government with armies and officers in full possession of means to compel obedience, operated upon Surget. He could not have avoided obedience. He could not know how the war would result. As Vattel well says, it was not his province to sit in judgment upon the orders of his government, for it was then his government, no matter how forcibly or unlawfully established, or how disastrously overthrown.

The law does not ask that impossible things should be done. It is not blind to the motives that influence men; it deals with men as responsible beings; responsible because they have liberty of thought and of action. Destroy this liberty of thought and action and responsibility at once ceases.

All governments must needs punish insurrection; self preservation requires it. But no government, and no court will ever require citizens of an organized government, though in rebellion, to risk life, limb and property in resistance to

it. It would be cruel beyond measure to do so. Instead of checking a disposition to rebellion, which all good governments should do, it would be encouraging it, and be breaking down one of the strongest props of government.

SIMRALL, J.

The pleas in bar set up in substance that the people and state of Mississippi, in combination and confederation with Louisiana, Alabama, Georgia, and other states, known as the Confederate States, were waging war against the United States ; that, by an act of the congress of the Confederate States, cotton, liable to fall into the hands of the hostile belligerents, was by the military to be destroyed ; that Gen. G. T. Beauregard was the commander of the army, having possession and control of the state of Mississippi ; that he, as such commander, directed an order to A. K. Farrar, provost marshal of Adams county, to burn the cotton on the Mississippi river, and the railroad ; that said Farrar commanded the defendant and one Minor, to execute it, by burning cotton on certain specified plantations on the Mississippi river ; and that, by authority thereof, defendant did destroy the plaintiff's cotton. The question, not free of difficulty, is, whether these facts excuse or justify the act complained of, as a trespass. That again requires an inquiry into, and an ascertainment of, the status of the respective belligerents toward each other during the war. We propose this inquiry, simply and purely, as a legal problem, to be deduced from the principles announced by the supreme court of the United States, the final arbiter of such questions. It may not be easy to aver principles from the publicists to be in all circumstances safely applied to the late war. It were a safer process of reasoning, to look to the leading historical facts, as exerting a controlling influence over legal questions arising out of them. Such was the course of the supreme court in the prize cases, 2 Black, 673. It will be remembered that the president in the recess of congress, April, 1861, issued his proclamations declaring a

blockade of certain ports. Captures were made on the high seas, and the question was, whether the vessels could be condemned as prizes of war. It was conceded by the court that the president could not declare or initiate a war, against a state or states ; but he was charged by the acts of 1795 and 1807, with the duty of using military means to suppress an insurrection, or repel an invasion. Capture and condemnation as prize are belligerent rights, and are only lawful in war. ، The court concluded that the insurrection at once culminated in civil war ; referring to the facts, "that it was not a loose, unorganized insurrection, having no defined boundary or possession. It acted as states claiming sovereign power over persons and property within their limits ; several of which states had combined to form a new confederacy. South of its military lines, it is enemy's territory, held in possession by an organized military power. All persons residing within this territory, whose property may be used to increase the revenues of the hostile power, are in this contest liable to be treated as enemies." From such premises the court determined that the blockade was a rightful measure, to aid in overcoming the insurrection, and was conclusive that "a state of war existed."

A civil war is never preceded by a declaration, it becomes such by its accidents, the number, power and organization of those who engage in it. The declaration of independence, the organization of great armies, the commencement of hostilities, induced some of the powers in May, 1861, to recognize the insurgents as belligerents, and gave to the conflict the character of "war." The court in the same case quote, approvingly, the language of Vattel, laying down the rules which apply in civil wars : "The nation is divided into two independent parties who consider each other as enemies and acknowledge no common judge. Having no common superior to judge between them, they stand in precisely the predicament of two nations who engage in a contest and have recourse to arms." In 2 Wall. 419, it is repeated that the war was governed by the principles of pub-

lic law, as alike applicable to civil and international wars, and that all the people inhabiting the insurrectionary states must be regarded as enemies and their property as enemies' property.

The president, by the act of 13th July, 1861, was directed to issue his proclamation, declaring what states and parts of states were in insurrection, and thereupon, intercourse and commerce was forbidden with such territory; and thereupon it was impressed with the status of hostile territory until the national authority was re-established.  The executive proclamation was so issued the seventeenth of August of the same year.  So that the late domestic war had two distinguishing features : 1st. From its careful and orderly organization, the magnitude of its preparations, and the strength of its resources, it at once assumed the proportions of " war."    2d. It had a territory of defined boundaries, within which, for a time, it exerted supreme authority.    In the means adopted by the United States for its suppression these were accepted facts, and the measures were suited to the exigencies.    The inhabitants and their property, whether of citizens or foreigners, were, for many purposes (pending the conflict), tainted as hostile.  As in foreign war, blockades were instituted, captures made on the high seas and condemned as prizes of war.    It was no defense in the prize court to allege that the vessel or its cargo was the property of a foreigner, or a citizen of friendly or loyal sentiments toward the United States ; if the cargo was the product of the hostile territory, it was lawful prize.    If the vessel was trading with it, that condemned it.

Ordinarily in the practice of modern times, movable property is not treated as spoils of war, except that an invading army may levy contributions or take without compensation, food for its subsistence, and animals for military purposes.

In the late war, both belligerents regarded cotton as a commodity of special and peculiar importance, not in the sense of its intrinsic value, or its worth as an article of com-

merce simply.   It was looked to by the Confederates as the chief source of credit, and the means by which arms and munitions of war were to be procured.   It was regarded, also, as an element of power, to influence favorably the western nations of Europe, so largely engaged in its manufacture, and dependent greatly on this country for supply. It is well known that the Confederate government was a very large owner of cotton, bought for the purpose of being used to procure military supplies and munitions.   The exclusion of American cotton from the consumption of the world had advanced its price in the manufacturing states and in Europe to very high rates.   It became the policy of the Confederate belligerent to prevent cotton falling into the possession of the United States.   Therefore, it was ordered by law of the Confederate congress that when, so exposed, it should be destroyed.   Thus cotton became *quasi* contraband of war, indirectly to one of the belligerents, a cheap munition, and source of supply; to the other, a strengthening of resources and a weakening of the adversary.   Hence, in Mrs. Alexander's case, 2 Wall. 418, while accepting the general rule to be, that " private property (under the modern usages of war) is not subject to seizure for the sake of gain," and ought to be "restricted to special cases dictated by the necessary operations of the war," yet cotton formed an exception to the general rule, on account of the peculiar character of the property, because "the 'rebels' regarded it as one of their main sinews of war," and their government, rather than permit it to fall into the possession of the national troops, has everywhere devoted it to destruction, however owned.   It was liable to destruction, rather than that it should remain an element of strength to the rebellion.   The capture of Mrs. Alexander's cotton, and its condemnation, was justified, both on the grounds of public policy and under the act of congress of August 6, 1861, making all property employed in aid of the rebellion, with consent of the owners, to be a lawful subject of capture and prize, wherever found.   It was because of the special value

attached to this property, as a means of prolonging the conflict, that the United States considered it, on motives of policy, subject to seizure and appropriation, and the Confederate belligerent, in order to prevent a "main sinew" of the war from falling into the possession of the United States forces, devoted it to the flames. It follows, therefore, that it was a lawful belligerent act, in certain circumstances, to destroy cotton. To relieve the party engaged in it from civil responsibility to the owner, he must be in such relation to the Confederate belligerent as to give the act the character of belligerency and hostility, his conduct must be guided and prompted by military authority.

No rights of sovereignty pertained to the Confederate States. As to the United States the Confederate States was an usurpation; it was not a *de facto* government; its legislation was a nullity, having no effect or validity in law. Thorington v. Smith, 8 Wall. 9, 10, 11, 12; United States v. Kuhler, 9 ib. 86. Therefore, in the last of these cases, it was held that a postmaster of the United States was not justified in paying money over to the Confederate government or its officers, because a law of the Confederate congress so required. The law itself was no justification, the act could only be excused when accomplished by a "*vis major.*"

It is averred in the pleas, that at the time the plaintiff's cotton was burned, the county of Adams was in the possession of and subject to the insurgent authority, capable of enforcing obedience, and constraining the conduct of the inhabitants. It was represented by the military power. A. K. Farrar was provost marshal under Gen. Beauregard as his superior. The order came from the general to the provost marshal, and through him to defendant and one Minor. The pleas negative the idea that the burning was voluntary, wanton or malicious. It is inferable, inasmuch as the command was given to the defendant, that he was amenable to the authority of the provost marshal. It was a military command, originating with the highest authority

in that district.   While those engaged in waging war against the United States might, after the war was over, be held to account by the sovereign for a breach of their allegiance ; yet, while it lasted, for all hostile acts done, they could rightfully appeal to the privileges and immunities of the public law as members of a belligerent power.   The destruction of certain sorts of private property, such as provisions, beasts of burden, or their removal beyond the reach of the enemy, ought to be referred to and adjudged of by the exigencies of war.   It is a legitimate belligerent right to destroy whatever private property is the subject of seizure and condemnation, in order to prevent it coming into the use of the enemy.   It would hardly be claimed that the Confederate general, who ordered the destruction of thousands of bales of cotton (whatever may be thought of the wisdom of his conduct), on the evacuation of New Orleans, could be held to account to the owners as a trespasser ; his plea would be that he did it to prevent the property inuring to the captors as spoils of war.

An order by the military power, in the control of the country, with means to compel obedience, directed to and executed by the persons named (as in this case to burn cotton) is a belligerent act, as much so (according to the policy of both belligerents) as the strategetic movement of an army or a battle.   The legislation of the Confederate congress, or of the state, affords no protection as imparting legality to the act.   The Confederate government, in judicial questions like this, can receive no other consideration than as the organized head of the insurgent power, part of the combination by arms to overthrow the national government and union.   The only import of such legislation is to supply evidence that the insurgent belligerent regarded cotton as its chief resource to supply the means of war, and, therefore, justified the policy of the United States to treat it as *quasi* contraband of war and subject to seizure.

But who is to judge of the propriety of Gen. Beauregard's order through the provost marshal ?   There was no tribunal

competent to stay it, or adjudge of its fitness and validity. Farrar, as a subordinate, had no discretion. He was shut up to obey. Those to whom he intrusted its execution bore toward him the same relation that he did to his superior. In the view which we have taken of the subject, we think the defense is complete when it is ascertained that the burning of the cotton was a hostile, belligerent act, in obedience to military order. The fact that the order was given to Surget and Minor necessarily implies that they were subject to obey. It was said by the chief justice, in Texas v. White, 7 Wall., that, while belligerent rights were conceded, the United States studiously avoided any other recognition of the Confederate States than as a part, as the organ of the military power. Whatever might be rightfully done in a foreign war by a belligerent in the prosecution of hostilities could be done by the Confederates. Murruin v. Insurance Co., 6 Wall. 10, 11, 12, 13; Hanger v. Abbott, ib. 335, 336, 337. The principle, having this extent of application, has been repeatedly stated by the supreme court of the United States; but while this concession is made, it has as often been declared that the sovereign, because of it, foregoes none of his rights to deal with his citizens for taking arms against him. All that we mean to affirm is, that acts considered legitimate in the prosecution of hostilities do not render the doers of them amenable to make reparation, in damages, to private persons who have been injured in their property. If horses had been taken from non-combatants (by impressment) for military service, it would hardly be maintained that those who did it would be liable personally to the owners, nor would the courts give a remedy to restore these animals to their former owners, if, at the close of the war, they were found in the possession of citizens who derived a right, through the military, as by a quarter-master's sale of condemned property.

The circumstance that the provost marshal published the order to the people of Adams county, indicates that they

were in sympathy with its motive and purpose, and that no serious difficulties would be encountered in carrying it out; nor can it be doubted that, if he had not the means at hand to overcome opposition and resistance, that ample force would have been promptly supplied.

Necessarily there were many excesses of authority, abuses of power, and wrongs done during the late war. In this, the greatest struggle of arms of modern times, employing the utmost energy and resources of the people; when nearly all of them, in one form or another, were participating in the struggle; when the courts, for the most part, were closed, and the laws, in the midst of arms, were silent, or, if they spoke at all, uttered but a feeble voice, it is not to be expected that, in all circumstances, personal rights and private property would be scrupulously respected, or that those who acted under military orders were at all times discreet and forbearing.

We do not think that it would be wise to encourage the exhuming of such transactions, of those distempered times, for adjudications in the courts.

Any other doctrine than that we have announced, as the result of mature reflection, would flood the courts with suits for compensation for property taken or destroyed during the war. That so few have been brought is persuasive that the conclusion of law we have reached has been sanctioned by the judgment and conscience of the community, it commends itself to the reason, and is promotive of quietude and charity, one toward another.

We have examined the cases referred to by counsel at the argument, reported in 2d and 4th West Virginia Reports. With deference and respect for that learned court, we are constrained to the belief that the court failed to apprehend and apply the correct principle of law to the facts before it.

We have looked to the pleas solely with reference to their substance, and not to their structure and technical sufficiency, so they were treated by counsel at the argument.

*Let the judgment be affirmed.*