---

## M. MᴄLᴀᴜɢʜʟɪɴ *v.* Jᴏsʜᴜᴀ Gʀᴇᴇɴ et al.

1. Mɪʟɪᴛᴀʀʏ Oʀᴅᴇʀs — Dᴇsᴛʀᴜᴄᴛɪᴏɴ ᴏꜰ Pʀᴏᴘᴇʀᴛʏ. — About the close of the late war, and after the surrender of the confederate forces, east of the Mississippi River, General Tucker, commanding a district including the city of Jackson, issued a military order, directing defendant Green, commanding a militia company, to destroy all the spirituous liquor in the city of Jackson.  Under said order the liquor of plaintiff was destroyed.  M. sued G. and others for the value of the property.  The defendant sets up this military order in justification, and insists that the order was necessary as a means of protecting the city of Jackson from destruction by drunken soldiers, who had been paroled, and were threatening to burn the town, and were searching for spirituous liquor.  *Held*, that if it is subversive of all civil rights, and places the civil authorities in absolute subordination to the military, to instruct the jury, to the effect, that a military officer in command of a district, has power to deal with private property, and may, if in his judgment it is fit and proper, order it to be destroyed, and that those who obey are protected by the order.

2. Mᴀʀᴛɪᴀʟ Lᴀᴡ—Wʜᴇɴ ɪᴛ Oʙᴛᴀɪɴs, ᴀɴᴅ ᴡʜᴇɴ ɪᴛ Cᴇᴀsᴇs.—In defining when martial law may rightfully obtain, it is limited to the theatre of active military operations, when no civil authority remains, and there is a necessity to furnish a substitute to preserve the safety of the army and society, and martial rule can only prevail until the laws can have their free course.  General Tucker being in command, with head quarters at Jackson, did not supersede the civil authorities, state or municipal, within the scope of his command.  His duties were purely military, without right to interfere with private citizens or their property, except within the limits here defined.

Eʀʀᴏʀ to the Circuit Court of Hinds County (1st Dist.).   Hon. Gᴇᴏ. F. Bʀᴏᴡɴ, Judge.

Plaintiff in error brought his suit against the defendants in error, to the December term, 1865, of the circuit court of Hinds county, in trespass to recover the value of seven barrels of whisky destroyed by the defendants. Defendants pleaded the general issue at the return term, and filed a notice of certain proof which they could offer under the general issue at the trial term. One trial was had and a verdict rendered for the defendants, and the case was brought to this court and reversed, and a new trial ordered; the case went back to the circuit court and was tried again, and a verdict rendered for the defendants. A motion was made for a new trial, which was by the court overruled, and the case is again brought to this court on writ of error.

The following is assigned for error:

1. The court erred in suffering notice to be filed at the trial term herein of an intent to prove matter in justification of the trespass alleged, after four terms of the court had elapsed, after a former reversal herein, and in point of time, just at the verge of trial.

2. Because the instructions given for plaintiff and defendants respectively, are calculated not to instruct, but to confuse and mislead the jury, being in terms contradictory and wholly irreconcilable.

3. The court erred in refusing to give instructions marked No. 1, 5, 6, 7, 9 and 10.

4. The court erred in granting instructions marked 1 and 2, for defendants, the same being contrary to law, vague and contradictory, the one styling Gen. Tucker a "Dist. Commander," and the other "the commander of a department."

5. The court erred in charging the jury in such terms as precluded them from trying the fact as to the legality and validity of the order, filed as the order of Gen. Tucker, assuming its legality, encroaching upon the province of the jury, and forestalling their verdict.

6. The verdict was contrary to the law as charged and the evidence as adduced.

*W. P. Harris*, for plaintiff in error :

In this case, the court is required to determine the value and efficacy of the security which we have, under our constitution and laws, for private property.

It may be affirmed that when private property is taken or destroyed, unless in the exceptional case of overwhelming necessity, there is responsibility somewhere to make good the loss to the owner. In this case there was panic only, and that ought never to be made the substitute of necessity. American Print Works v. Lawrence, 3 Zabriskie (N. J.) Rep., 590, and cases there cited.

It is therefore a case in which it is necessary for those who actually destroyed the plaintiff's property, to show legal authority for the act, and the evidence on this point must be definite and unmistakable. All forms of public authority, and all those entitled to exercise it, are defined by law. The military code under which General Tucker assumed to act, confers no power to destroy private property in the circumstances of this case; and, moreover, he was simply in command of a military post, after military operations had ceased. In point of fact, at the date of the order, the army to which he was attached had surrendered — war had ceased. We look in vain to the civil code for the authority here asserted. The act of 1864, p. 65, relied on to sustain the forcible destruction of the plaintiff's property, will be found not to apply.

That act indicates the persons authorized to destroy distilleries, and declares whisky kept for sale a common nuisance. The defendants are not the officers or persons so indicated. The legislative declaration that whisky kept for sale is a common nuisance, if designed to subject it to destruction by any person or combination of persons, whose antipathies might impel them to destroy it, is clearly unconstitutional.

The right to abate a common nuisance is limited to the destruction of those things which in themselves violate a common right, such as obstructions in highways. Here the whisky is not declared a nuisance as such, but a nuisance only on account of the

unlawful intent of the owner in regard to its use.    For this intent the law adjudges forfeiture, but the intent must be judicially ascertained, otherwise the act is plainly in violation of the Bill of Rights.    Sedgwick's Const. & Stat. Law, 540.

*C. E. Hooker*, on the same side:

1. The Rev. Code of 1857, p. 493, gives authority to the defendant to file notice of proof under the general issue, but, to avail himself of this statute, it must be pursued strictly, and it was not pursued in this case.    The suit was brought in December, 1865, and the notice was not filed until the trial term, 1872.    41 Miss., 599.

2. No military order is binding after the government has ceased to exist.    It was the gravamen of the defense, that an order had issued, and from a person possessing the authority to issue it, and in refusing to give the plaintiff's fifth instruction, the court virtually said to the jury, that the plaintiff could not be permitted to show the invalidity of the order under which the defendant attempted to justify the trespass laid in the declaration.

*T. J. & F. A. R. Wharton*, for defendants in error :

I. As far as the giving or refusing instructions by the circuit judge is concerned, we think it sufficient to refer to the case of Ford v. Surget.    46 Miss. R., 130.

Those asked for defendant and given were founded upon the rules laid down in that case.    The following language from the opinion is as applicable to 'this case as to that:    "An order by the military power in the control of the country, with means to compel obedience, directed to be executed by the persons named, is a belligerent, as much so as the strategic movements of an army, or a battle."    Apply that principle to this case, the commanding general, Tucker, of this department, gave the order to defendant Green, who was in command of a company and instructed by the proper authority to act under his, Tucker's, orders.

Further from said opinion : "Who is to judge of the propriety of Gen. Beauregard's order through the provost marshal?    There

was no tribunal competent to stay it or adjudge its fitness and va-
lidity.    Farrar, a subordinate, had no discretion.    He was shut up
to obey.    Those to whom he intrusted its execution bore toward
him the same relation that he did to his superior      *    *    *
Necessarily, there were many excesses of authority, abuses of
power and wrongs done during the late war.    In this, the great-
est struggle of modern times, employing the utmost energies and·
resources of the people, when nearly all of them, in one form or
another, were participants in the struggle, when the courts, for the
most part, were closed, and the laws, in the midst of arms, were
silent, or, if they spoke at all, uttered but a feeble voice, it is not
to be expected that, in all circumstances, personal rights and pri-
vate property would be scrupulously respected, or, that those who
acted under military orders, were at all times discreet and for-
bearing.    We do not think it would be wise to encourage the ex-
huming of such transactions of those distempered times for ad-
judication in the courts    *    *    *    The fact that the order was
given to Surget and Minor *necessarily implies that they were subject to
obey.*"

In his oral argument in this case, Judge HARRIS, in comment-
ing upon the fact that the order to Green is signed by Tucker as
" Brigadier Gen'l," said there is no proof of what army he is an
officer, or that he had any authority to issue such orders.    We re-
ply that the court judicially shows the fact that he was a briga-
dier general in the Confederate army, and at the date of his order
to Green, was in command of the department in which the city of
Jackson is located.    May we not say that " the fact that the order
was given " to Green " necessarily implies that he was subject to
obey."    The answer is that Green was in command of a military
company at Jackson, and required to report to and obey orders of
·whoever should be, for the time, commander of the department;
that Tucker was so in command when he gave the order to Green,
under which he and his codefendants acted in his behalf.    As it
was the duty of Green to obey such orders, so it was the duty of
his codefendants to obey his, Green's, orders.

Whether the orders of either were right or wrong, is a question not to be considered. What would have been the penalty of disobedience and what protection against its infliction? There was a *superior power*, whether legal or not, *ready to enforce the orders* and the penalty of disobedience.

II. As to the objection founded on admission in evidence of the notice of matters of defense, returned or under "general issue," and of any matters of justification or excuse, we reply, the notice was filed January 13, 1871, nearly 18 months before the trial. It was not urged that plaintiff was taken by surprise, nor did he ask for a continuance. Both parties went into the trial on the merits, defendants offering proof in excuse or justification, all matters specified in said notice, and plaintiff offering proof of facts to aggravate the alleged trespass of defendants.

III. We insist that, independent of being protected by the order of General Tucker, defendants in error were justified in their action by act of April 5, 1864, p. 63, "an act to prevent distillation of spirituous liquors, and to declare the distilleries to be public and common nuisances, and to authorize the same to be abated," etc. Section 2, after declaring distilleries to be nuisances, makes it lawful for all officers of the state and Confederate armies to abate and destroy them. Said act suspends all laws licensing the sale of liquors during the war, and forbids the sale in any quantity except for medicinal purposes.

We admit that the judgment of the circuit court is correct, that the ends of justice have been reached, and that the *second* verdict of a jury should not be disturbed, especially as there is no probability that a different result would occur on a third trial.

*W. & I. R. Yerger*, on the same side:

1. While it is true that private property cannot be taken for public use without just compensation being made to the owner, there are times when necessity justifies its destruction, and when the injury sustained is "*damnum absque injuria*." For instance, if a fire is raging in a city, it is perfectly lawful to tear down and de-

stroy houses liable to the flames in order to prevent the spread of the conflagration; or if a wild beast were loose in the streets of a town, or a mad dog or other rabid animal were at large, it would be perfectly lawful to destroy them for the public safety.  This is the great law of self defense which belongs alike to communities and to individuals, and which is never surrendered.  The facts of this case bring it within the rule, and the first instruction given for the defense is correct.  2 Kent. Com., 339, 397; 1 Dallas R., 363; 4 Term R., 797; 1 Zabriskie's (N. J.) R., 248.

2. The second instruction for defendant in the court below is not objectionable.  The act of 1861 declared the keeping of liquor for sale in this state to be a nuisance, and authorized its destruction.  It is so easy to avoid the effect of an unpopular law by pronouncing it to be unconstitutional, that it has become the common recourse of all parties.  It is certainly true that there may be nuisances, and that when they become public or common, they may be abated.  What is a nuisance, and who is to determine or declare it?  Are there no nuisances but such as are so declared by the common law?  Where has the constitution limited the power of the legislature to declare and define what shall and what shall not be a nuisance?  The legislature may exercise this power arbitrarily or even oppressively, as they may every other power, but still the abuse of the power does not take away the right to exercise it.  It is questionable whether opium is a greater poison than whisky.  Suppose such quantities of opium were introduced into the state for sale, and were sold in the community in such quantities as to endanger the health and lives of the people, to induce the commission of great crimes, and demoralize the social fabric, would it not be necessary and proper to make the keeping of it for sale a common nuisance?  Will it be pretended that the power does not exist, and that the legislature is to determine the time at which it is to be exercised?  To say that a man has property in whisky, and that the legislature cannot authorize its destruction, simply begs the question.  The same reasoning would

apply to every other nuisance. There is no legislative power which has been more frequently exercised in England and in this country, than that which defined, declared and punished public nuisances. And there are many things declared by statute to be nuisances, which were unknown to the common law as such. 4 Black. Com., 167; Rev. Code 1857, art. 139, p. 597; Hutch. Code, 943, 944.

SIMRALL, J., delivered the opinion of the court.

The destruction of the plaintiff's whisky complained of as a trespass, occurred just at the close of the active hostilities of the late civil war.

The defendants justified the act by reason of an order issued by Gen. Tucker, commanding a district including the city of Jackson, to Joshua Green, commanding a militia company, directing him to destroy the spirituous liquor in the city of Jackson. That this order was given as a necessary precaution to the safety of the city of Jackson, and the protection of its citizens from the violence of drunken soldiers who had been paroled, and were in large numbers in the city, threatening to burn down the town ; were searching for liquor, and when under its influence were utterly incontrolable.

Also that the board of mayor and aldermen (of which the plaintiff was a member), passed a resolution, of which plaintiff approved, to have all the spirituous liquors in the town destroyed, to prevent the soldiers from getting possession of it. These matters were set forth in a "notice" attached to the plea of "not guilty," which under the statute, fulfills the office of special pleas.

It was not controverted that if the seizure and destruction of the whisky was not warranted by the military order, under which Joshua Green and his associates acted, or by the resolution of the city council, or under the pressure and emergency of necessity arising out of the circumstances disclosed in the "notice," then the defendants are trespassers. Wrong doers not in the sense of a

wanton invasion of the plaintiffs' property, but rather as the doers of an unlawful act, under color of authority, under the influence of honest motives; and believing that they were performing a duty for the common good. We are satisfied that if liable at all, it is only for the value of the property destroyed, and not for vindictive or punative damages.

It would seem from the record that the defendants rested their defense mainly upon the order of Gen. Tucker. That brings up for consideration the extent of his powers as a military officer.

When war is flagrant, in the territory of its operations, the civil law, in many of its mandates and over some subjects, retires and gives place to martial law, or the laws of war, and many things may be lawfully done which would be grossly wrong and oppressive in time of peace, which are, nevertheless, permitted and sanctioned by military law. In Mrs. Alexander's Cotton case, 2 Wal., 418, it was said by the chief justice that private property, under the modern usages of war, is not subject to seizure for the sake of gain, and ought to be restricted to special cases dictated by the operations of the war; in that case " cotton " was excepted out of the operations of the rule. See also 1 Kent's Com., 98. If a belligerent takes from its own citizens property for military uses, it is under a plain duty to make compensation. The right of seizure by an enemy (in modern times) has been limited to contraband of war ; and things actually necessary for the operations of the war, and effects, perhaps, in a place carried by storm. In the early case of Respublica v. Sparhawk, 1 Dall. Penn. Rep., 388, it was held to be legitimate to remove private property necessary to the maintenance of an army or useful to the enemy, and in danger of falling into his hands, and if captured at the place they were deposited, the government would not be responsible for the consequent loss. In that case, the government did not appropriate the goods, but they still continued private property. If such authority may be exerted, in case of emergency, the property might be destroyed to save it from the enemy.

Where property of a citizen may be taken possession of or destroyed to prevent its falling into the hands of the enemy, the government is under a duty to make compensation. Mitchell v. Harmony, 13 How., 134. Nor would the officers or those acting under orders, be trespassers. Ibid. In the same case, the court say : it is impossible to define the particular circumstances of danger or necessity in which the power may be exercised. Each case must depend on its own circumstances. The principle was carried to its full limit in Ford v. Surget, 46 Miss. Rep., 150. It were, perhaps, well to bear in mind in judicial reviews of acts that occurred at such times, that it is very difficult to fully comprehend the situation of the country and state of facts as they presented themselves at the time to those engaged in the transactions.

A fundamental principle of the common law was, that the owner could not be deprived of his property, except according to the law of the land. Judge Story (3 Com. on Const.), says, that *magna charta* did not, on this subject, confer a new right, but was only declaratory of the common law.

The law exacts accountability from those who do violence either to the person or property under claim of authority, and considers of the rightfulness and extent of the authority, in determining as to the sufficiency of the excuse and justification.

Numerous instances have occurred in the British courts, of suits brought against the governors of colonies, and others in civil and military authority abroad, for alleged wrongs done to individuals and their property, and in every case, they were put to their justification, and if the act complained of was done without lawful authority, recoveries were had. Lord Bellamont's case, 2 Salk., 625 ; Wey v. Jally, 6 Mod. R., 195. Other cases were mentioned by Lord Mansfield in Mostyn v. Fabrigas, 1 Cowp., 174, 5, 6. One was the suit of a carpenter against Sabine, who was governor of Gibraltar, for approving the sentence of a court martial, under which the plaintiff had been flogged. Not being amenable to

martial law, the defendant was a trespasser.    Another was a case of trespass against Capt. Gambier, of the Royal Navy, who, under orders of Admiral Boscawen, stationed off the coast of Nova Scotia, pulled down some shanties in which the sutlers sold liquor to the sailors, which injured their health and efficiency.    Yet this action was sustained in England, although it was urged that it was "local."    The judges would not entertain the objection, because there would be no remedy in Nova Scotia.

If the power exercised by a military officer is conferred by law, trusting to his discretion for a proper use of it, then, although he acts unwisely, he is not a trespasser, nor are those who obey his orders.    But if he justifies the act done under an order, which for its rightfulness rests alone on "necessity," the onus is upon the defendant to show the existence of such necessity.    13 How., S. C., *supra.*

A case in analogy to this is Jones v. City of Richmond, 18 Gratt., 522–3–4.    The evening preceding the evacuation of Richmond by the confederate forces, the city council passed an ordinance directing the destruction of all the spirituous liquors, on the premises where found, and appointed a committee of citizens to carry the ordinance into execution.    The last section pledged the faith of the city to compensate the owners the value of the liquors. The motive was to prevent the riot, tumult, and disorder of a drunken soldiery, which might endanger citizens and their property.

The court of appeals held the city liable.    In upholding the validity of the ordinance, the court refer to the constitutional provision forbidding the taking of private property for public use, without making compensation, and treat the destruction of the liquor as a devotion of private property to the public good, as within the equity of the constitutional provision, and as also authorized by the police powers, conferred upon the city government.    The court say the modes were open to the city " to destroy the liquor, and leave the question of liability to be litigated, and

determined by the courts; or, secondly, to contract to pay the value. Had the council pursued the first mode, it would have been responsible in trespass."

It is distinctly held that if the city had not contracted to pay, it would have been liable in trespass.

The City of Richmond v. Smith, 15 Wallace, 432, arose out of the same condition of facts. In the circuit court of the United States, the city justified on these allegations, that the confederate government had determined, on the evacuation of the city by its forces, to burn certain warehouses; that said warehouses were set fire to and destroyed by order as aforesaid, and the house in which was the plaintiff's liquor was contiguous thereto, and was about to take fire, at the instant the committee were destroying the liquor, and was actually consumed. And so the liquor would have been lost by the fire, if the committee had not destroyed it.

The supreme court hold the plea to be no bar to the action, for the reason "that impending dangers give no immunity to one man to destroy the property of another."

In Mayor etc., of New York v. Lord, 18 Wend., 129, 130, the suit was to recover from the city the value of a building and its contents (merchandise), destroyed in order to arrest the spread of the conflagration. "It was laid down by the chancellor delivering the opinion of the court for the correction of errors, as a well-settled principle at common law, that in case of *actual* necessity, to prevent the spreading of a fire, the ravages of a pestilence, the advance of a hostile army or any other great calamity, private property may be taken, used or destroyed for the relief, protection or safety of the many. Those for whose benefit the loss was incurred ought, in natural justice to make compensation, but the actors are not trespassers.

In some instances the law has conformed to this principle of natural equity, and administers practical justice. Maritime contributions, to apportion individual losses, rest upon that founda-

tion. The ship, and freight and cargo contribute to indemnify the owner whose goods have been the subject of a jettison to save the ship and cargo from an impending peril.

The provision in the American constitution, " that private property shall not be taken for public use without compensation," has its origin in the same principle. Such, also, is the basis of the statutes of several of the states, charging the city treasury the value of houses torn down to arrest the progress of a conflagration. But in those instances where the plea of " necessity " prevails as a justification, the doers of the act complained of as injurious are not liable as trespassers. The injured parties have no redress at law, but may have strong claims on the municipal or public treasury. Parham v. Justices, 9 Georgia, 349.

Private property is sacred from the violent interference of others, and whoever takes, injures or destroys it, is a trespasser unless he shows a justification. Necessity — extreme, imperative and overwhelming — may constitute such justification; but expediency or utility will not answer.

Justification under a plea of necessity is always a question of fact to be tried by a jury, unless the law-making department has provided some other mode. Hale v. Lawrence, 1 Zab., 730 ; Mitchell v. Harmony, 13 How. S. C., 115, *supra.* If " necessity " be appealed to as excuse or justification, it must be shown to have sprung out of the circumstances that are alleged to have invoked it.

Let us test the instructions to the jury, by the principles we have been discussing.

The first charge, granted at the prayer of the defendants, declares, in effect, that a military officer in command of a district has power to deal with private property, and may, if in his judgment it is fit and proper, order it to be destroyed, and that those who obey are protected by the order. The jury are informed that, if Joshua Green was the captain of a militia company, subject to the commands of General Tucker, commandant of a district including the city of Jackson, and that Green and his asso-

30

ciates, by authority of an order from General Tucker, did destroy the whisky, then they must find for defendants.

Such a doctrine is subversive of all civil rights, and places the civil authorities in absolute subordination to the military. In Colonel Mitchell's case, 13 How., *supra.* the seizure of the goods, resulting in their ulterior loss, was made in the enemy's country. Yet he was held to be a tort feasor, because the goods were not at the time exposed to capture by the Mexican army, and were not taken to be used in his own military operations. It was put upon Mitchell to show the one state of facts or the other, in justification.

If it was not referred to an officer commanding military operations to judge finally and conclusively of the necessity of the seizure of the property of a citizen, lawfully with his property at that place, with less reason can it be claimed that General Tucker, who was commanding in this state, could, at his discretion, destroy the property of a citizen; and with the more force does the argument press upon him to show his right.

The instruction rests upon the pretension, so emphaticaly repudiated by the supreme court in Milligan's case, 4 Wallace, 124, viz: "That in time of war, the commander of an armed force (if in his opinion exigencies demand it, and of which he is to judge) has the power, within his district, to suspend all civil rights, and subject citizens as well as soldiers, to the rule of his will." And if that position be true, "then, in time of war, foreign or domestic, each district commander, may, on the plea of *necessity,* substitute military force for and to the exclusion of the laws."

In defining where "martial rule may rightfully obtain, it is limited to the theatre of active military operations, where no civil authority remains, and there is a necessity to furnish a substitute to preserve the safety of the army and society ; and martial rule can only prevail until the laws can have their free course."

When the plaintiff's whisky was destroyed, active hostilities had ceased ; all the confederate armies, east of the Mississippi

river, had surrendered, and the whisky was not exposed to capture, nor could it have been necessary to Gen. Tucker's military uses. But more than this, martial law did not prevail, nor did there exist that state of things in which it could rightfully exist.

But the authorities, to which we have referred, distinctly announce the doctrine, that in flagrant war, power does not belong to a military officer, merely as such, to take or to destroy the property of the citizen, unless a necessity exists to apply it to military purposes, or to pevent its capture by the enemy.

But in this case, the war, so far as actual military hostile movements were concerned, had ceased by an actual surrender of the confederate armies east of the Mississippi river, before the act complained of was committed.

The authorities teach the further doctrine, that military orders do not protect and justify an invasion of private property, either in war or in time of peace, if done without the warrant of the law, applicable to the one state or the other.

The circumstance that Gen. Tucker was district commander, with headquarters at Jackson, did not to any degree supersede the civil authorities, whether state or municipal, within the scope of his command. His duties were purely military, without right to interfere with private citizens or their property, except within the just limits we have attempted to define.

The first instruction for the defendants is erroneous; the second, which embodies the idea, applied to the condition of facts therein recited, is also erroneous.

Since this case must be remanded for a third trial, we have thought it proper to consider carefully the ground of defense exclusively relied upon on the last trial, and also to examine somewhat the other matters of defense set up in the notice. This, perhaps, was unnecessary, since the defendants did not offer evidence that they were acting under the authority of the city council.

Judgment reversed, and cause remanded.