## Dow *v.* Johnson.

1. On the trial of an action at law, when the judges of the Circuit Court are opposed in opinion on a material question of law, the opinion of the presiding judge prevails; but the judgment rendered conformably thereto may, without regard to its amount, be reviewed on a writ of error, upon their certificate stating such question.
2. An officer of the army of the United States, whilst serving in the enemy's country during the rebellion, was not liable to an action in the courts of that country for injuries resulting from his military orders or acts; nor could he be required by a civil tribunal to justify or explain them upon any allegation of the injured party that they were not justified by military necessity. He was subject to the laws of war, and amenable only to his own government.
3. When any portion of the insurgent States was in the occupation of the forces of the United States during the rebellion, the municipal laws, if not suspended or superseded, were generally administered there by the ordinary tribunals for the protection and benefit of persons not in the military service. Their continued enforcement was not for the protection or the control of officers or soldiers of the army.
4. A district court of Louisiana — continued in existence after the military occupation of the State by the United States, and authorized by the commanding general to hear causes between parties — summoned a brigadier-general of the army of the United States to answer a petition filed therein, setting forth that a military company had, pursuant to his orders, seized and carried off certain personal property of the plaintiff, who alleged that the seizure was unauthorized by the necessities of war, or martial law, or by the superiors of that officer. Judgment by default was rendered April 9, 1863, against him for the value of the property. When sued in the Circuit Court of the United States, upon the judgment, he pleaded that the property was taken to supply the army. *Held*, on demurrer to the plea, that the State court had no jurisdiction of the cause of action, and that the judgment was void.

ERROR to the Circuit Court of the United States for the District of Maine.

The facts are stated in the opinion of the court.

The case was argued by *The Attorney-General* and *Mr. E. B. Smith*, Assistant Attorney-General, for the plaintiff in error, and by *Mr. Thomas J. Durant* for the defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

The defendant in the court below, the plaintiff in error here, Neal Dow, was a brigadier-general in the army of the United States during the late civil war, and in 1862 and 1863 was

stationed in Louisiana in command of Forts Jackson and St. Philip, on the Mississippi River, below New Orleans. These forts surrendered to the forces of the United States in April, 1862. The fleet under Admiral Farragut had passed them and reached New Orleans on the 25th of the month, and soon afterwards the city was occupied by the forces of the United States under General Butler. On taking possession of the city, the General issued a proclamation, bearing date on the 1st of May, 1862, in which, among other things, he declared that until the restoration of the authority of the United States the city would be governed by martial law ; that all disorders, disturbances of the peace, and crimes of an aggravated nature, interfering with the forces or laws of the United States, would " be referred to a military court for trial and punishment ; " that other misdemeanors would be subject to the municipal authority, if it desired to act ; and that civil causes between parties would " be referred to the ordinary tribunals." Under this proclamation, the Sixth District Court of the City and Parish of New Orleans was allowed to continue in existence, the judge having taken the oath of allegiance to the United States.

In January, 1863, General Dow was sued in that court by Bradish Johnson, the plaintiff in this case. The petition, which is the designation given in the system of procedure in Louisiana to the first pleading in a civil action, set forth that the plaintiff was a citizen of New York, and for several years had been the owner of a plantation and slaves in Louisiana, on the Mississippi River, about forty-three miles from New Orleans ; that on the 6th of September, 1862, during his temporary absence, the steamer " Avery," in charge of Captain Snell, of Company B of the Thirteenth Maine Regiment, with a force under his command, had stopped at the plantation, and taken from it twenty-five hogsheads of sugar ; and that said force had plundered the dwelling-house of the plantation and carried off a silver pitcher, half a dozen silver knives, and other table ware, the private property of the plaintiff, the whole property taken amounting in value to $1,611.29 ; that these acts of Captain Snell and of the officers and soldiers under his command, which the petition characterized as " illegal, wanton, oppressive, and unjustifiable," were perpetrated under a

verbal and secret order of Brigadier-General Neal Dow, then in the service of the United States, and in command of Forts Jackson and St. Philip, who, by his secret orders, which the petition declared were " unauthorized by his superiors, or by any provision of martial law, or by any requirements of necessity growing out of a state of war," wantonly abused his power, and inflicted upon the plaintiff the wrongs of which he complained ; and therefore he prayed judgment against the General for the value of the property.

To this suit General Dow, though personally served with citation, made no appearance. He may have thought that during the existence of the war, in a district where insurrection had recently been suppressed, and was only kept from breaking out again by the presence of the armed forces of the United States, he was not called upon by any rule of law to answer to a civil tribunal for his military orders, and satisfy it that they were authorized by his superiors, or by the necessities growing out of a state of war. He may have supposed that for his military conduct he was responsible only to his military superiors and the government whose officer he was.

Be that as it may, or whatever other reason he may have had, he made no response to the petition ; he was therefore defaulted. The Sixth District Court of the Parish of New Orleans did not seem to consider that it was at all inconsistent with his duty as an officer in the army of the United States to leave his post at the forts, which guarded the passage of the Mississippi, nearly a hundred miles distant, and attend upon its summons to justify his military orders, or seek counsel and procure evidence for his defence. Nor does it appear to have occurred to the court that, if its jurisdiction over him was recognized, there might spring up such a multitude of suits as to keep the officers of the army stationed in its district so busy that they would have little time to look after the enemy and guard against his attacks. The default of the General being entered, testimony was received showing that the articles mentioned were seized by a military detachment sent by him and removed from the plantation, and that their value amounted to $1,454.81. Judgment was thereupon entered in favor of the plaintiff for that sum, with interest and costs. It bears date April 9, 1863.

Upon this judgment the present action was brought in the Circuit Court of the United States for the District of Maine. The declaration states the recovery of the judgment mentioned, and makes *profert* of an authenticated copy. To it the defendant pleaded the general issue, *nul tiel record*, and three special pleas. The object of the special pleas is to show that the District Court had no jurisdiction to render the judgment in question, for the reason that at the time its district was a part of the country in insurrection against the government of the United States, and making war against it, and was only held in subjection by its armed forces. It is not important to state at length the averments of each of these pleas. It will be sufficient to state the material parts of the second plea and a single averment of the third. The second plea, in substance, sets up that as early as February, 1861, the State of Louisiana adopted an ordinance of secession, by which she attempted to withdraw from the Union and establish an independent government; that from that time until after April 9, 1863, the date of the judgment in question, she was in rebellion against the government of the United States, making war against its authority; that in consequence the military forces of the United States engaged in suppressing the rebellion took forcible possession of that portion of the State comprising the district of the Sixth District Court of New Orleans, and held military occupation of it until long after April 9, 1863, during which time martial law was established there and enforced; that the defendant was then a brigadier-general in the military service of the United States, duly commissioned by the President, and acting in that State under his orders and the articles of war; that by the general order of the President of July 22, 1862, military commanders within the States of Virginia, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Texas, and Arkansas were directed, in an orderly manner, to seize and use any property, real or personal, which might be necessary or convenient for their several commands as supplies, or for other military purposes; that the defendant, in the performance of his duty as a brigadier-general, was in command of troops of the United States in Louisiana; and that the troops by his order seized from the plaintiff, then a citizen of that State, certain chattels

necessary and convenient for supplies for the army of the
United States, and other military purposes; and that for that
seizure the action was brought in the Sixth District Court of
New Orleans against him, in which the judgment in question
was rendered; but that the District Court had no jurisdiction
of the action or over the defendant at its commencement, or at
the rendition of the judgment.

The third plea also avers that, for the purpose of suppressing
the rebellion and restoring the national authority, the govern-
ment of the United States, through its proper officers, declared
and maintained martial law in Louisiana, from May 1, 1862,
until long after the 9th of April, 1863, and deprived all the
courts in that State, including the Sixth District Court of New
Orleans, of all jurisdiction, except such as should be conferred
on them by authority of the officer commanding the forces of
the United States in that State, and that no jurisdiction over
persons in the military service of the United States, for acts
performed in the line of their duty, was by such authority con-
ferred upon that court.

To the first plea, that of *nul tiel record*, the plaintiff replied
that there was such a record, of which he prayed inspection;
and the record being produced, the court found in his favor.
To the special pleas the plaintiff replied that the District Court
had lawful jurisdiction over parties and causes of action within
its district at the time and place mentioned, and to render the
judgment in question. To the replication the defendant de-
murred; and upon the demurrer two questions arose, upon
which the judges in the Circuit Court were opposed in opinion,
namely: 1st, whether the replication is a good and sufficient
reply to the special pleas; and, 2d, whether the Sixth District
Court, at the time and place mentioned, had jurisdiction of the
parties and cause of action, to render the judgment in question.

By statute, when the judges of the Circuit Court are opposed
in opinion upon any question arising on the trial of a cause,
the opinion of the presiding justice prevails, and judgment is
entered in conformity with it. Here the presiding justice was
of opinion that the replication was a sufficient reply to the spe-
cial pleas, and that the District Court had jurisdiction over the
parties and the cause, and to render the judgment in question.

Accordingly, the plaintiff had final judgment upon the demurrer, which was entered for $2,659.67 and costs; and the defendant has brought the cause here by writ of error on a certificate of division of opinion.

The important question thus presented for our determination is, whether an officer of the army of the United States is liable to a civil action in the local tribunals for injuries resulting from acts ordered by him in his military character, whilst in the service of the United States, in the enemy's country, upon an allegation of the injured party that the acts were not justified by the necessities of war.

But before proceeding to its consideration there is a preliminary question of jurisdiction to be disposed of. The act of Feb. 16, 1875, " to facilitate the disposition of cases in the Supreme Court of the United States, and for other purposes," provided, that whenever by the laws *then in force* it was required that the matter in dispute should exceed the sum or value of $2,000, exclusive of costs, in order that the judgments and decrees of the circuit courts of the United States might be re-examined in the Supreme Court, such judgments and decrees thereafter rendered should not be re-examined in the Supreme Court, unless the matter in dispute should exceed the sum or value of $5,000, exclusive of costs. 18 Stat. 315. It is therefore contended that a judgment cannot be reviewed by this court, upon a certificate of division of opinion between the judges of the Circuit Court, if the judgment be under $5,000; and the judgment in the present case is under that amount. We do not think, however, that this conclusion is warranted by the language of the act in question. That act makes no change in the previous laws, except as to amounts necessary to give the court jurisdiction, when the amount is material. Where before $2,000 was the sum required for that purpose, afterwards $5,000 was the sum. But before that act questions arising in the progress of a trial could be brought to this court for determination upon a certificate of division of opinion, without reference to the amount in controversy in the case. The original act of 1802, allowing this mode of procedure, was always held to extend our appellate jurisdiction to material questions of law arising in all cases, criminal as well as civil, without

regard to the amount in controversy or the condition of the litigation. Its defect consisted in the delays it created by frequently suspending proceedings in the midst of a trial. To obviate this defect the first section of the act of June, 1872, was passed, requiring the case to proceed notwithstanding the division, the opinion of the presiding justice to prevail for the time being; and this feature is retained in the Revised Statutes. Sects. 650, 652, 693. The benefit of the certificate can now be had after judgment upon a writ of error or appeal. That is the only material change from the original law. We have no doubt, therefore, of our jurisdiction in this case.

This brings us to the consideration of the main question involved, which we do not regard as at all difficult of solution, when reference is had to the character of the late war. That war, though not between independent nations, but between different portions of the same nation, was accompanied by the general incidents of an international war. It was waged between people occupying different territories, separated from each other by well-defined lines. It attained proportions seldom reached in the wars of modern nations. Armies of greater magnitude and more formidable in their equipments than any known in the present century were put into the field by the contending parties. The insurgent States united in an organization known as the Confederate States, by which they acted through a central authority guiding their military movements; and to them belligerent rights were accorded by the Federal government. This was shown in the treatment of captives as prisoners of war, the exchange of prisoners, the release of officers on parole, and in numerous arrangements to mitigate as far as possible the inevitable suffering and miseries attending the conflict. The people of the loyal States on the one hand, and the people of the Confederate States on the other, thus became enemies to each other, and were liable to be dealt with as such without reference to their individual opinions or dispositions. Commercial intercourse and correspondence between them were prohibited, as well by express enactments of Congress as by the accepted doctrines of public law. The enforcement of contracts previously made between them was suspended, partnerships were dissolved, and the courts of each belligerent were

closed to the citizens of the other, and its territory was to the other enemy's country. When, therefore, our armies marched into the country which acknowledged the authority of the Confederate government, that is, into the enemy's country, their officers and soldiers were not subject to its laws, nor amenable to its tribunals for their acts. They were subject only to their own government, and only by its laws, administered by its authority, could they be called to account. As was observed in the recent case of *Coleman* v. *Tennessee*, it is well settled that a foreign army, permitted to march through a friendly country, or to be stationed in it by authority of its sovereign or government, is exempt from its civil and criminal jurisdiction. The law was so stated in the celebrated case of *The Exchange*, reported in the 7th of Cranch. Much more must this exemption prevail where a hostile army invades an enemy's country. There would be something singularly absurd in permitting an officer or soldier of an invading army to be tried by his enemy, whose country it had invaded. The same reasons for his exemption from criminal prosecution apply to civil proceedings. There would be as much incongruity, and as little likelihood of freedom from the irritations of the war, in civil as in criminal proceedings prosecuted during its continuance. In both instances, from the very nature of war, the tribunals of the enemy must be without jurisdiction to sit in judgment upon the military conduct of the officers and soldiers of the invading army. It is difficult to reason upon a proposition so manifest; its correctness is evident upon its bare announcement, and no additional force can be given to it by any amount of statement as to the proper conduct of war. It is manifest that if officers or soldiers of the army could be required to leave their posts and troops, upon the summons of every local tribunal, on pain of a judgment by default against them, which at the termination of hostilities could be enforced by suit in their own States, the efficiency of the army as a hostile force would be utterly destroyed. Nor can it make any difference with what denunciatory epithets the complaining party may characterize their conduct. If such epithets could confer jurisdiction, they would always be supplied in every variety of form. An inhabitant of a bombarded city would have little hesitation in declaring the

bombardment unnecessary and cruel. Would it be pretended that he could call the commanding general, who ordered it, before a local tribunal to show its necessity or be mulcted in damages? The owner of supplies seized or property destroyed would have no difficulty, as human nature is constituted, in believing and affirming that the seizure and destruction were wanton and needless. All this is too plain for discussion, and will be readily admitted.

Nor is the position of the invading belligerent affected, or his relation to the local tribunals changed, by his temporary occupation and domination of any portion of the enemy's country. As a necessary consequence of such occupation and domination, the political relations of its people to their former government are, for the time, severed. But for their protection and benefit, and the protection and benefit of others not in the military service, or, in other words, in order that the ordinary pursuits and business of society may not be unnecessarily deranged, the municipal laws — that is, such as affect private rights of persons and property, and provide for the punishment of crime — are generally allowed to continue in force, and to be administered by the ordinary tribunals as they were administered before the occupation. They are considered as continuing, unless suspended or superseded by the occupying belligerent. But their continued enforcement is not for the protection or control of the army, or its officers or soldiers. These remain subject to the laws of war, and are responsible for their conduct only to their own government, and the tribunals by which those laws are administered. If guilty of wanton cruelty to persons, or of unnecessary spoliation of property, or of other acts not authorized by the laws of war, they may be tried and punished by the military tribunals. They are amenable to no other tribunal, except that of public opinion, which, it is to be hoped, will always brand with infamy all who authorize or sanction acts of cruelty and oppression.

If, now, we apply the views thus expressed to the case at bar, there will be no difficulty in disposing of it. The condition of New Orleans and of the district connected with it, at the time of the seizure of the property of the plaintiff and the entry of the judgment against Dow, was not that of a country

restored to its nominal relations to the Union, by the fact that they had been captured by our forces, and were held in subjection. A feeling of intense hostility against the government of the Union prevailed, as before, with the people, which was ready to break out into insurrection upon the appearance of the enemy in force, or upon the withdrawal of our troops. The country was under martial law; and its armed occupation gave no jurisdiction to the civil tribunals over the officers and soldiers of the occupying army. They were not to be harassed and mulcted at the complaint of any person aggrieved by their action. The jurisdiction which the District Court was authorized to exercise over civil causes between parties, by the proclamation of General Butler, did not extend to cases against them. The third special plea alleges that the court was deprived by the general government of all jurisdiction except such as was conferred by the commanding general, and that no jurisdiction over persons in the military service for acts performed in the line of their duty was ever thus conferred upon it. It was not for their control in any way, or the settlement of complaints against them, that the court was allowed to continue in existence. It was, as already stated, for the protection and benefit of the inhabitants of the conquered country and others there not engaged in the military service.

If private property there was taken by an officer or a soldier of the occupying army, acting in his military character, when, by the laws of war, or the proclamation of the commanding general, it should have been exempt from seizure, the owner could have complained to that commander, who might have ordered restitution, or sent the offending party before a military tribunal, as circumstances might have required, or he could have had recourse to the government for redress. But there could be no doubt of the right of the army to appropriate any property there, although belonging to private individuals, which was necessary for its support or convenient for its use. This was a belligerent right, which was not extinguished by the occupation of the country, although the necessity for its exercise was thereby lessened. However exempt from seizure on other grounds private property there may have been, it was always subject to be appropriated, when required by the neces-

sities or convenience of the army, though the owner of property taken in such case may have had a just claim against the government for indemnity.

The case of *Elphinstone* v. *Bedreechund* is an authority, if any were needed, that a municipal court has no jurisdiction to adjudge upon the validity of a hostile seizure of property; that is, a seizure made in the exercise of a belligerent right. There it appeared that a city of India had been captured by the British forces, and a provisional government established, which subsequently held undisturbed possession of the place. Several months after its occupation, the members of the provisional government seized the private property of a native, under the belief that it was public property intrusted to his care by the hostile sovereign. The native had been refused the benefit of the articles of capitulation of a fortress, of which he was governor, but had been permitted to reside under military surveillance in his own house in the city, where the seizure was made. At the time, there were no hostilities in the immediate neighborhood, and the civil courts were sitting for the administration of justice; but the war was not at an end throughout the country, and there was a feeling of great hostility on the part of the people of the place, which was only prevented from breaking out into insurrection by the presence of an armed force. In these respects the position of the place was similar to that of New Orleans and the adjacent country under the command of General Butler. The property seized consisted of gold coin, jewels, and shawls; and the owner having died, an action for their value was brought by his executor against the members of the provisional government who ordered the seizure, and judgment was rendered against them in the Supreme Court of Bombay. That court appeared to be controlled in its decision by the fact that for some months before the seizure the city had been in the undisturbed possession of the provisional government, and that civil courts, under its authority, were sitting there for the administration of justice. But on appeal to the Privy Council the judgment was reversed. "We think," said Lord Tenterden, speaking for the Council, "the proper character of the transaction was that of a hostile seizure made, if not *flagrante*, yet *nondum cessante bello*, regard being had

both to the time, the place, and the person; and, consequently, that the Municipal Court had no jurisdiction to adjudge upon the subject, but that, if any thing was done amiss, recourse could only be had to the government for redress." 1 Kn. 361. Here, the special pleas allege that the articles of property taken by the military detachment under General Dow were seized by his order, as necessary and convenient supplies for the occupying army. It was a hostile seizure, as much so as that of the property in the case cited, being made, like that one, in the exercise of a belligerent right, upon the propriety or necessity of which the Municipal Court had no authority to adjudge.

This doctrine of non-liability to the tribunals of the invaded country for acts of warfare is as applicable to members of the Confederate army, when in Pennsylvania, as to members of the National army when in the insurgent States. The officers or soldiers of neither army could be called to account civilly or criminally in those tribunals for such acts, whether those acts resulted in the destruction of property or the destruction of life; nor could they be required by those tribunals to explain or justify their conduct upon any averment of the injured party that the acts complained of were unauthorized by the necessities of war. It follows that, in our judgment, the District Court of New Orleans was without jurisdiction to render the judgment in question, and the special pleas in this case constituted a perfect answer to the declaration. See *Coleman* v. *Tennessee*, 97 U. S. 509; *Ford* v. *Surget*, id. 594; also *Le-Caux* v. *Eden*, 2 Doug. 594; *Lamar* v. *Browne*, 92 U. S. 187; and *Coolidge* v. *Guthrie*, 2 Amer. Law Reg. N. S. 22.

We fully agree with the presiding justice of the Circuit Court in the doctrine that the military should always be kept in subjection to the laws of the country to which it belongs, and that he is no friend to the Republic who advocates the contrary. The established principle of every free people is, that the law shall alone govern; and to it the military must always yield. We do not controvert the doctrine of *Mitchell* v. *Harmony*, reported in the 13th of Howard; on the contrary, we approve it. But it has no application to the case at bar. The trading for which the seizure was there made had been permitted by the Executive Department of our govern-

ment. The question here is, What is the law which governs an army invading an enemy's country ? It is not the civil law of the invaded country ; it is not the civil law of the conquering country : it is military law, — the law of war, — and its supremacy for the protection of the officers and soldiers of the army, when in service in the field in the enemy's country, is as essential to the efficiency of the army as the supremacy of the civil law at home, and, in time of peace, is essential to the preservation of liberty.

Our decision upon the questions certified to us is, that the replication is not a good and sufficient reply to the special pleas ; and that the Sixth District Court of New Orleans, at the time and place mentioned, had not jurisdiction of the parties and cause of action to render the judgment in question. The judgment of the Circuit Court must, therefore, be reversed, and the cause remanded with directions to that court to enter final judgment for the defendant on the demurrer to the replications ; and it is

*So ordered.*

Mr. Justice Swayne dissented from the opinion of the court on the point relating to the jurisdiction of this court, but concurred therewith on the remaining questions involved in the case.

Mr. Justice Clifford and Mr. Justice Miller dissented.

Mr. Justice Clifford. Officers and soldiers in the military service are not amenable, in time of war, to process from the civil tribunals for any act done in the performance of their duties : but if the injurious act done to person or property was wholly outside of the duty of the actor, and was wilfully and wantonly inflicted, for the mere purpose of oppression or private gain, the party by whom or by whose orders it was committed may be answerable in the ordinary courts of justice, except when the civil tribunals are silenced by the exigencies of military rule or martial law. *Luther* v. *Borden*, 7 How. 1, 46.

Private property, in case of extreme necessity, in time of war

or of immediate and impending public danger, may be impressed into the public service, or may be seized and appropriated to the public use, or may even be destroyed without the consent of the owner and without antecedent compensation. Extreme cases of the kind may doubtless arise, as where the property taken is imperatively necessary in time of war to construct defences for the preservation of a military post at the moment of an impending attack by the enemy, or to supply food or clothing to a suffering or famishing army destitute of such necessaries and without other means of such supplies.

Such emergencies in the public service have and may hereafter occur in time of war, and in such cases no doubt is entertained that the power of the government is ample to supply for the moment the public wants in that way to the extent of the immediate public exigency; but the public danger must be imminent and impending, and the emergency in the public service must be extreme and imperative and such as will not admit of delay or a resort to any other source of supply.

Exigencies of the kind do arise in time of war or impending public danger; but it is the emergency only that gives the right, and it is clear that the emergency must be shown to exist before the taking can be justified. *United States* v. *Russell,* 13 Wall. 623.

Public convenience authorizes the exercise of the right of eminent domain, subject to the condition that due provision is made for compensation; and public necessity, in time of war or impending public danger, may authorize the taking of private property without any such provision, to supply for the moment the public wants, to the extent of the public exigency, which cannot be supplied in any other way.   2 Kent, Com. (12th ed.) 338.

Nothing but the emergency will warrant the taking; and it is settled law in this court that the officer who makes the seizure cannot justify his trespass merely by showing the orders of his superior, the rule being that an order to commit a trespass can afford no justification to the person by whom it is executed. *Mitchell* v. *Harmony,* 13 How. 115.

Support to all the principles before enunciated is found in the very able opinion of the court, given by Chief Justice Taney, in which he fully admits that private property may be

taken by a military commander to prevent it from falling into the hands of the enemy, and that it may also be taken, in certain extreme cases, for public use without just compensation. Reasonable doubt upon that subject cannot be entertained ; but he proceeds to show, what is equally plain, that it cannot be done in the first case unless it appears that the danger was immediate and impending, nor in the second, unless it appeared that the necessity and urgency were such as would not admit of delay. *Farmer* v. *Lewis*, 1 Bush, 66.

Where a trader during war is engaged in trading with a portion of the enemy country that has been reduced to subjection, and his trading there is permitted and encouraged by the invading army, his goods cannot be seized on the ground that he is engaged in an unlawful trade with the enemy. In such a case, the officer seizing the property becomes liable for the abuse of his authority, and the owner of the goods is entitled to recover in trespass for the damage suffered. *Harmony* v. *Mitchell*, 1 Blatch. 548.

Judgment was rendered, April 9, 1863, against the defendant in the Sixth District Court of New Orleans, in an action of trespass for the unlawful taking and conversion of the goods and chattels of the plaintiff described in the schedule annexed to the writ. Payment of the judgment being refused, the plaintiff brought an action of debt on the same against the defendant in the Circuit Court for the Maine District, where the defendant resides. Service was made, and the defendant appeared and pleaded *nul tiel record* and three special pleas, as follows : 1. That the court which rendered the judgment had no jurisdiction of the case, for the reason that the military forces of the United States, prior to the rendition of the judgment, took forcible possession of New Orleans, and held such military possession of the locality. 2. That the said court had no jurisdiction of the case, for the reason that he, as a military commander, seized the goods and chattels mentioned as supplies for the army. 3. That the said court had no jurisdiction of the case, for the reason that he was a military officer, and that in taking the goods and chattels he acted in obedience to the orders of his superior officers.

· These pleas, containing as they did new special matters, prop-

erly concluded with a verification, which made it necessary for the replication, if in the general form as now allowed, to tender an issue to the country.    Instead of adding the *similiter*, the defendant filed a general demurrer to the replication; and the objection now is, that the replication is defective in form, it being too general to amount to a traverse of the new matters set forth in the special pleas.

Two answers to that may be given : 1. That the form accords with that given by the most approved text-writers upon the subject.    Stephen, Plead. (9th Am. ed.) 60; 1 Chitty, Plead. (16th ed.) 606.    2. That the demurrer should have been special, in order to avail the defendant.  1 Chitty, Plead. (16th ed.) 694 ; Stephen, Plead. (9th ed.) 40.

Hearing was had, and the court, both judges concurring, found in favor of the plaintiff, that there is such a record as that set forth and described in the declaration.

Two questions also arose under the demurrer of the defendant to the replication of the plaintiff filed to the three special pleas.    Those questions are as follows : 1. Whether the replication is a good and sufficient reply to the three special pleas of the defendant.    2. Whether said Sixth District Court at the time and place aforesaid had jurisdiction of the parties and the cause of action alleged in the declaration.

Certificates of division of opinion between the judges of the Circuit Court under a former act gave the Supreme Court jurisdiction of the questions certified, but the universal rule was that the Supreme Court would only consider the single question or questions certified.  *Ogle* v. *Lee*, 2 Cranch, 33.

Nothing could come before the court under such certificate except the single question or questions certified here by the circuit judges, in respect to which they were divided in opinion.    *Ward* v. *Chamberlain*, 2 Black, 430–434; Rev. Stat., sect. 652.

Jurisdiction acquired in that mode of proceeding was limited to the points certified, and could not be extended by a certificate of division to any thing except what would be open to revision here under a writ of error or appeal.  *Davis* v. *Braden*, 10 Pet. 286; *Packer* v. *Nixon*, id. 408; *Wayman* v. *Southard*, 10 Wheat. 1, 66.

Both of those questions were certified at the time and were duly entered of record; and the act of Congress provides that whenever such a difference occurs, the opinion of the presiding justice shall prevail and be considered the opinion of the court for the time being. Pursuant to that statutory regulation, the presiding justice proceeded to state that he was of the opinion: 1. That the replication of the plaintiff is a good and sufficient reply to the three special pleas pleaded by the defendant. 2. That the said Sixth District Court of New Orleans did, at the time and place aforesaid, have jurisdiction of the parties and the cause of action to render the judgment set forth and described in the declaration.

Having sustained the replication as a sufficient reply to the three special pleas, he overruled the demurrer to the replication and adjudged the special pleas bad, and rendered judgment for the plaintiff in the amount of the prior judgment and lawful interest.

Errors assigned in this court are as follows: 1. That the court erred in finding that there is such a record as that mentioned in the declaration. 2. That the court erred in ruling that the replication is a good and sufficient reply to the three special pleas. 3. That the court erred in ruling that the Sixth District Court had jurisdiction of the parties and the cause of action. 4. That the court erred in the rendition of the judgment.

Before discussing those matters, it becomes necessary to determine the preliminary question whether this court, under existing laws, has jurisdiction to re-examine the judgment of the Circuit Court in this case. Prior to the act of the 16th of February, 1875, all judgments or decrees of the circuit courts in civil actions at common law or suits in equity, where the matter in dispute exceeded the sum or value of $2,000, exclusive of costs, might be re-examined in the Supreme Court by a writ of error or appeal. 1 Stat. 84; 2 id. 244; 17 id. 196.

Alterations of great moment in the mode of removing certain final judgments and decrees from the Circuit Court to the Supreme Court had been made before the passage of that act; but the Congress on that day enacted that "such judgments and

decrees hereafter rendered shall not be re-examined in the Supreme Court, unless the matter in dispute shall exceed the sum or value of $5,000, exclusive of costs." 18 id. 316.

Beyond all doubt, the exclusion of jurisdiction to the Supreme Court is universal in respect to all judgments and decrees of the Circuit Court where the matter in dispute does not exceed the sum or value of $5,000. Words more fitting to express such an intent, or more effectual to that end, cannot be found in our language, and it is equally clear that they will admit of no exception unless they are emasculated of their universal meaning; and yet it is suggested that the final judgment or decree of a circuit court may still, if the record contains a certificate of the judges of the Circuit Court that they were opposed in opinion upon any point in the case, be re-examined in this court even though the matter barely exceeds the sum or value of $500, exclusive of costs, which is the smallest amount cognizable in the Circuit Court in civil actions at common law or in suits in equity.

When our judicial system was organized, jurisdiction was given to the circuit courts, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of $500, and the United States are plaintiffs or petitioners, or an alien is a party, or the suit is between a citizen of the State where the suit is brought and a citizen of another State. More than ninety years have elapsed since that provision was enacted, and yet no alteration has been made in it as to the amount required to give the circuit courts jurisdiction in suits of a civil nature at common law or in equity. 1 id. 78; 18 id. 470; Rev. Stat., sect. 629.

Judges of the Circuit Court are required to certify, at the request of either party or their counsel, any division of opinion occurring between them on the trial or hearing of such a suit, and the provision is that such certificate shall be entered of record. Id., sect. 652.

Beyond doubt, either party may require such a certificate to be entered if any such division of opinion occurred in any civil action or suit in equity cognizable in the Circuit Court, no matter if the amount in controversy only exceeds by one cent,

exclusive of costs, the sum or value of $500. Provision is made
that in admiralty causes the Circuit Court shall find and state
the facts and conclusions of law separately, but the requirement
does not extend to suits in equity; from which it follows that,
if the opinion just read is correct, the Supreme Court must
re-examine the facts as well as the law in every such final
decree brought here, even though the amount in dispute barely
exceeds $500, merely because the record contains such a cer-
tificate of division of opinion, in spite of the express enactment
of Congress that such final decrees shall not be re-examined in
the Supreme Court unless the matter in dispute shall exceed
the sum or value of $5,000.

Certificates of the kind, both in civil and criminal cases, when
made before judgment, as directed by the original act, were cer-
tified under the seal of the Circuit Court to the Supreme Court,
and their effect was to suspend all proceedings in the cause which
would prejudice the merits, until the mandate of the Supreme
Court went down and was filed.    2 Stat. 159.

Mere points were sent up under the sixth section of that act,
nor was the proceeding any bar in a civil suit to a writ of error
or appeal, subsequent to the final judgment or decree, to remove
the whole case into the Supreme Court for re-examination.   Mat-
ters of difference of opinion between the judges of the Circuit
Court in criminal cases are still required to be certified here
before judgment or sentence in that mode of procedure, with-
out any change whatever.    Every day's experience proves that
proposition; but regulations of a very different character have
been provided where the difference of opinion occurs in civil
actions or suits in equity.    17 Stat. 196; Rev. Stat., sects.
650–652.

Whenever such a difference of opinion shall occur between
the judges of the Circuit Court in a civil action or suit in
equity, the provision is that the opinion of the circuit justice or
circuit judge shall prevail, and be considered the opinion of the
court for the time being; but when the final judgment or decree
in such action or suit shall be entered, it is made the duty of
the judges, in case such a difference of opinion occurred in the
trial or hearing, to make the required certificate of the same, —
in which event it is provided that either party may remove

such final judgment or decree into the Supreme Court, on writ of error or appeal.

Like the original act, the Revised Statutes require that the points in difference shall be stated by the judges and certified, and that such certificate shall be *entered of record* without any requirement, as in the original act, that it shall be certified under the seal of the Circuit Court to the Supreme Court at their next session. Evidently no such proceeding is required, as it is not contemplated that the certificate of division will ever come before the Supreme Court for re-examination unless the final judgment or decree is removed here by writ of error or appeal. Id., sect. 652.

Existing laws require that final judgments in civil actions shall precede the writ of error or appeal to remove the cause into this court for re-examination, no matter whether the questions for revision are raised in the record by a bill of exceptions, a certificate of division of opinion, an agreed statement of facts, or by demurrer, or even by a special finding of the court, or by a special verdict. Jurisdictional limitation, prior to the passage of the act of the 16th of February, 1875, was that the matter in dispute must exceed the sum or value of $2,000, exclusive of costs; but that act raised the minimum of jurisdiction from $2,000 to $5,000, as already explained, in all civil actions, the same section providing that the certificate of division of opinion in criminal cases shall be made as before, and be certified under the seal of the Circuit Court to the Supreme Court. 18 Stat. 316; Rev. Stat., sect. 650.

Circuit-court judgments or decrees in civil actions or suits in equity, in order that they may be re-examinable in the Supreme Court, must be final, and the matter in dispute must exceed the sum or value of $5,000, exclusive of costs; and they must be removed into the Supreme Court by writ of error or appeal, and they cannot be removed here in any other way which will give this court jurisdiction to reverse or affirm the judgment or decree. Id., sect. 691; 18 Stat. 316.

Power to re-examine any judgment or decree of the Circuit Court is not given to the Supreme Court unless the case comes within that category, the act of Congress now in force providing that such judgments and decrees, entered after the act

went into operation, " shall not be re-examined in the Supreme Court unless the matter in dispute shall exceed the sum or value of $5,000, exclusive of costs."

Prior to the act of June 1, 1872, the certificate of division of opinion gave the Supreme Court jurisdiction to decide the questions in difference without regard to the amount in dispute, as it applied both to civil and criminal cases, and in both had the effect to suspend action prejudicial to the merits until the decision of the Supreme Court was received. It preceded final judgment or decree, and was certified to the Supreme Court under the seal of the Circuit Court. Such certificates in criminal cases are still required to be certified in that way, and still give the Supreme Court jurisdiction of the points certified, wholly irrespective of the merits or of any other question in the case. 17 id. 196.

Since the passage of that act, the proceeding in civil cases and suits in equity is altogether different, the office of the certificate of division of opinion, like that of a bill of exceptions, being merely to raise the questions in the record, the requirement that it shall be certified under the seal of the Circuit Court to the Supreme Court at its next session being entirely omitted in the new regulation.

Bills of exception are required to place on the record what rested in parol, and they are allowed in the Circuit Court irrespective of the amount in dispute; but a writ of error will not lie to remove the cause into the Supreme Court unless the amount in dispute exceeds the sum or value of $5,000, exclusive of costs. Where the amount in dispute is less than that amount, the review takes place on a motion for new trial in the Circuit Court.

Differences of opinion between the circuit judges may be certified by them when they sit together, irrespective of the amount, and the effect is that the certificate becomes part of the record; and if the amount in dispute is sufficient to give the Supreme Court jurisdiction, the cause may be removed here by writ of error or appeal for re-examination; but if the amount in dispute is insufficient for that purpose, then the only remedy for the losing party is a motion for new trial in the Circuit Court.

Other modes for raising questions for review in appellate courts are well known : as, for example, it may be done by an agreed statement of facts, or by demurrer to the declaration or a material pleading, or by a special finding of the court, or by a special verdict, — in all of which cases the final judgment or decree may be removed into the Supreme Court by writ of error or appeal, if the matter in dispute exceeds the sum or value of $5,000, exclusive of costs ; but if the amount in dispute does not exceed that amount, the act of Congress is peremptory that it shall not be re-examined in the Supreme Court.

Under the original act the judges of the Circuit Court were required to make the certificate and cause it to be certified to the Supreme Court before final judgment was rendered, but under the new act the final judgment in civil cases is required to precede the certificate ; nor is there any requirement that the difference of opinion shall ever be certified to the Supreme Court under the seal of the Circuit Court.   17 Stat. 196.

None of these propositions, it is believed, can be successfully controverted ; and, if not, it follows to a demonstration that this court has no jurisdiction of the case to reverse or affirm the decree of the Circuit Court, it appearing that the judgment of the Circuit Court was only for the sum of $2,650.67.   It seems absurd to hold that jurisdiction exists in such a case, when the act of Congress provides that judgments and decrees of the circuit courts shall not be re-examined in the Supreme Court unless the matter in dispute shall exceed the sum or value of $5,000, exclusive of costs.

Suppose I am wrong in this, then it becomes necessary to re-examine the question whether the Sixth District Court of New Orleans had jurisdiction of the cause of action and of the par ties at the time the judgment described in the declaration was rendered.

It appears that the plaintiff, who was a loyal citizen of New York, owned a valuable plantation in the parish of Placquemines, situated on the right bank of the Mississippi River, about forty miles from New Orleans, and that the defendant, at the time of the service of the writ and of the rendition of the judgment, was a military officer in the service of the United States, stationed at the Parapet, near the city ; that on the 5th

of September, 1862, a small military detachment, acting under the verbal and secret orders of the defendant, landed at the plantation of the plaintiff, and wrongfully, as alleged, took therefrom and from his dwelling-house there situated the goods and chattels mentioned in the schedule annexed to the petition for redress, of the value of $1,611.29. Redress being refused, the plaintiff instituted the present suit to recover the value of the property wrongfully seized and detained. Personal service having been made, and the defendant having neglected and refused to appear, he was defaulted. Testimony was taken as to the circumstances of the seizure and as to the value of the property converted; and the court, after due consideration, rendered judgment in favor of the plaintiff for the sum of $1,454.81. Execution issued, and the sheriff returned that the defendant could not be found. Satisfaction of the execution being refused, the plaintiff, on the 30th of March, 1866, instituted the present action of debt to recover the amount of that judgment.

Apart from the technical defences already considered, the only defence is that the Sixth District Court of New Orleans had no jurisdiction of the parties or of the cause of action to render this judgment. Attempt is made to maintain that defence solely upon the ground that, inasmuch as the defendant was a military officer in the service of the United States, he was not amenable to civil process from a court of justice for the taking of the goods and chattels of the plaintiff at the time and place when and where the same were seized and carried away.

Support to that defence is attempted to be drawn from the fact that the State, on the 26th of January, 1861, passed an ordinance of secession and joined the rebellion; that war between the Confederacy and the United States ensued; and that the war, at the time the action was commenced and the judgment rendered, was still flagrant and not ended. Military officers, it is contended, are not subject to civil process under such circumstances, even though the acts which are the subject of complaint constitute an abuse of power and were perpetrated without authority.

War undoubtedly followed secession, and it is equally true that, prior to May 1, 1862, New Orleans was occupied by the

Confederate forces.  Rebel dominion in the city, from the pas-
sage of the secession ordinance to the date last mentioned, was
complete.  Vice-Admiral Farragut reached New Orleans on
the 25th of April, and as flag-officer he demanded the surren-
der of the city; but the surrender was not made.  Transports
conveying the troops under the command of Major-General
Butler arrived on the first day of May.  Certain proceedings
followed, which are fully detailed in a prior decision.  Suffice
it to say, that this court decided in that case that the military
occupation of the city by the Union forces became complete
May 1, which is the date of the proclamation published by
General Butler.  *The Venice,* 2 Wall. 258–274.  There was
no hostile demonstration then nor any subsequent disturbance,
and this court unanimously determined that all the rights and
obligations resulting from such occupation and from the terms
of the proclamation might properly be regarded as existing
from that date.

Two clauses of the proclamation may be referred to as evi-
dencing the intent and public import of the document: 1. That
" all the rights of property of whatever kind will be held invio-
late, subject only to the laws of the United States."  2. That
" all foreigners who have not made oath of allegiance " to the
Confederacy " will be protected in their persons and property
as heretofore."

Wherever the national forces were successful in re-establish-
ing the national authority, the rights of persons and of property
were immediately respected and enforced.  Persons of intelli-
gence everywhere will see that that proclamation was framed
in the same spirit and with the same intent as that which actu-
ated Congress in passing the first act to suppress insurrection.
12 Stat. 257, sect. 5.

Authority was given to the President by that act, under cer-
tain conditions, to declare by proclamation that the inhabitants
of a State or part of a State were in a state of insurrection; and
the provision was, that when that was done all commercial in-
tercourse between such insurrectionary district and the rest of
the United States should cease and be unlawful so long as such
condition of hostility should continue.  *The Reform,* 5 Wall.
628.

Certain States and parts of States were declared to be in insurrection in the proclamation made by the President, Aug. 16, 1861, and in that document he expressly exempted from that condition all districts or parts of districts which might from time to time be occupied and controlled by the forces of the United States engaged in the dispersion of the insurgents. Intercourse for commercial purposes was not prohibited with such places or districts while so occupied and controlled. They were not regarded as in actual insurrection, or their inhabitants as subject to treatment as enemies. 12 Stat. 1262.

Commercial intercourse was never wholly interdicted, and the regulations were framed in the same spirit of forbearance towards the places and districts where the national authority was re-established. "As far as possible," said Chief Justice Chase, "the people of such parts of the insurgent States as came under the national occupation and control were treated as if their relations to the national government had never been interrupted." *The Venice, supra.*

Sufficient appears in the Code of Practice of the State to support the proposition that the district courts of Louisiana were, before the rebellion, courts of general jurisdiction, as it provides that their jurisdiction extends over all civil causes where the amount in dispute exceeds fifty dollars; and this court, in construing that provision, held that its legal import was to render those tribunals courts of general jurisdiction in all civil causes not embraced within the exception. *Fournequet* v. *Perkins,* 7 How. 160, 169; *White* v. *Cannon,* 6 Wall. 443–450.

Judgment in this case was rendered in the Sixth District Court of New Orleans, which was established before the rebellion and had jurisdiction in all civil causes. Rev. Stats. (La.), title Judiciary, sect. 72.

Enough appears to show that the Sixth District Court was created by statute more than fifteen years before the insurrection, and that it was in the full exercise of its jurisdiction when the secession ordinance was passed; that it was never abolished or suspended by any military or other order or power; that it was kept open subsequent to the proclamation of General Butler, the judge and clerk being in attendance from day to day,

as business demanded. " Civil causes between party and party," said the proclamation, " will be referred to the ordinary tribunals." After General Shepley was appointed military governor, in August following, the Sixth District Court held its regular sessions at the time and place fixed by the State statute. Early after the capture of the city the judge took the oath of allegiance and resumed the proper functions of his office, with the recognition and approbation of the military authorities. From the moment the judge of the Sixth District Court took the oath of allegiance, as required by the commanding general, June 14, 1862, the court continued in the exercise of all its powers, the same as before the rebellion, and was the only court that did, until General Shepley, in the fall of that year, appointed judges in the first, second, and third judicial districts.

Military conquerors of foreign states in time of war may doubtless displace the courts of the conquered country, and may establish civil tribunals in their place for administering justice; and in such cases it is unquestionably true that the jurisdiction of suits of every description is transferred to the new tribunals. *United States* v. *Rice*, 4 Wheat. 246 ; *Cross* v. *Harrison*, 16 How. 164. But that concession proves nothing in this case, as it is universally conceded that the mere occupancy of the territory does not necessarily displace the local tribunals of justice. *Pepin* v. *Lachenmeyer*, 45 N. Y. 27–33. They were not displaced in this case, but suffered to continue in the exercise of their judicial powers, with the recognition and approbation of the military commander.

Important differences exist between a foreign war waged for conquest, and a civil war waged to restore insurrectionary districts to their allegiance to the rightful sovereign. Nor could the commander of the department, after the date of the proclamation of General Butler, seize private property as booty of war, or make any order confiscating it. *Planters' Bank* v. *Union Bank*, 16 Wall. 483.

On the 17th of August in the same year, General Butler, as the commander of the department, issued an order requiring the banks of the city to pay over to the chief quartermaster of the army all money in their possession belonging to hostile corporations or hostile official persons. Payments were made

by the defendant bank, pursuant to that order, of a large amount deposited by the plaintiff bank. Reimbursement having been refused, the plaintiff bank brought suit to recover the amount, and judgment was ultimately rendered in favor of the plaintiff in the sum of $24,713. Exceptions were filed by the defendant, and the cause was removed into this court, where the judgment was affirmed.

Two points were ruled by this court: 1. That the order was one which the commanding general had no authority to make, and that it was wholly invalid. 2. That payment to the chief quartermaster did not satisfy the debt.

In disposing of the case, Mr. Justice Strong remarked, that the city of New Orleans was then in the quiet possession of the United States forces; that it had been captured fifteen months before that time, and that undisturbed possession had been maintained ever after its capture; that the order was not an attempt to seize the property *flagrante bello*, nor was it a seizure for the immediate use of the army; that it was an attempt to confiscate private property, which, though it may be subjected to confiscation by legislative authority, is, according to the modern law of nations, exempt from capture as booty of war.

Concede all that, and still the defendant rests his defence on the proposition of his third special plea, that the Sixth District Court had no jurisdiction over the person of the defendant, because he was a military officer in the army of the United States, acting under the orders of his superiors. But this is not the case of a foreign war in which the courts of the enemy assumed jurisdiction over an officer of the invading army. Nothing of the kind is pretended, and if it were, it could not be supported for a moment. Instead of that, the United States, throughout the active hostilities, were engaged in putting down the insurrection and in suppressing the rebellion, with a view to the re-establishment and complete restoration of the national authority. Throughout the whole period of the civil war the government maintained that the ordinances of secession were void, and that they did not and could not have the effect to take a State out of the Union or to annul its constitution or laws.

War followed insurrection, but all know that as soon as the military forces of the United States wrested any portion of the national territory from the rebellious authorities, and acquired full and complete control of it, the normal condition of affairs became restored, as indicated in the first act of Congress upon the subject, and the proclamation of the President, which soon followed the passage of that act.

Towns, provinces, and territories, says Halleck, which are retaken from the conqueror during the war, or which are restored to their former sovereign by the treaty of peace, are entitled to the right of postliminy; and the original sovereign owner, on recovering his dominion over them, whether by force of arms or by treaty, is bound to restore them to their former state. In other words, he acquires no new right over them, either by the act of recapture or of restoration. . . . He rules not by any newly acquired title which relates back to any former period, but by his antecedent title, which, in contemplation of law, has never been devested. Halleck, Int. Law, 871.

When a town, reduced by the enemy's arms, is retaken by those of her own sovereign, says Vattel, she is restored to her former condition, and reinstated in all her rights. Vattel (ed. by Chitty), 395.

Pressing emergency in time of war may authorize the seizure of private property before providing for compensation, but, to justify the taking without the consent of the owner, the necessity must be apparent, leaving no available alternative.

Four months before the marauding expedition, acting under the verbal and secret orders of the defendant, entered the plantation and dwelling-house of the plaintiff, during his temporary absence, and seized the goods and chattels mentioned, the city of New Orleans had fallen into the undisturbed possession of the Union forces under the command of General Butler, who never authorized the defendant to perpetrate the acts of plunder charged in the declaration. Evidence of necessity in this case is wholly wanting, without which the acts charged in the declaration cannot be justified. *Sellards* v. *Zomes*, 5 Bush, 90.

Beyond doubt, he might have appealed to the commanding

general for an order that the suit should be discontinued; but he did not, and it may be that his reason for not doing so was that he knew if he did a court of inquiry would be ordered. Public order was fully restored in the city, and the courts were open, and every person was in the full enjoyment of the protection promised in the military proclamation issued four months before, when the Union forces entered the city. Process in due form of law was issued, and personal service having been made, the defendant, if he had any defence, was bound to appear and plead it.

Actual insurrection in that locality had ceased, and the military control of the Union forces was substantial, complete, and permanent; and, being such, it drew after it the full measure of protection to persons and property consistent with the fact that the war outside and in other localities had not terminated. Rebel authority was replaced by the national authority, and all the inhabitants were in the enjoyment of the protection and rights promised in the military proclamation then in force.

Hostilities having ceased in that locality, the defendant was not engaged in any active military operations. His military duties did not prevent his attendance at the court to make his defence. No evidence is exhibited in the pleadings showing any condition of affairs, military or civil, excusing the defendant from refusing to obey a judicial summons; and if the court had no jurisdiction, he should have appeared and so pleaded. Having neglected to do that at the time, he cannot now attack the judgment collaterally in a suit brought upon it in another jurisdiction. When the jurisdiction has attached, the judgment is conclusive for all purposes and is not open to inquiry upon the merits; and if conclusive in the State where it was pronounced, it is equally conclusive everywhere in the courts of the United States. 2 Story, Const., sect. 1813; *Christmas* v. *Russell*, 5 Wall. 290, 302; *Mills* v. *Duryee*, 7 Cranch, 483.

It is not even suggested that the military authorities ever interfered to prevent the suit, and, as matter of fact, it is known that no such interference ever took place. Instead of that, the clear inference is that the defendant preferred to submit to the jurisdiction of the court where the suit was brought,

rather than subject himself to a military court of inquiry; and, if so, it was his own choice, and he cannot now be permitted to attack the judgment which was rendered in consequence of his own negligence to appear and plead his defence.

Confirmation of the proposition that it was the duty of the defendant to appear and plead his defence is derived from the act of Congress passed for the protection of those prosecuted for any search, seizure, arrest, or imprisonment made, done, or committed, or acts omitted to be done under and by virtue of any order of the President or under his authority, or under color of any law of Congress, the provision being that " such defence may be made by special plea or under the general issue, in the insurrectionary districts in which the national authority had been restored *by undisputed possession and control.*"    12 Stat. 756, sect. 4.

By the fifth section of the same act it is provided that all civil suits and criminal prosecutions of the character described in the fourth section, in which final judgment may be rendered in the Circuit Court, may be carried by writ of error to the Supreme Court, whatever may be the amount of the judgment. At the date of the rendition of the judgment in question the United States had undisturbed possession and control of the territory embraced within the jurisdiction of the Sixth District Court, which was fully recognized by the military governor of the State as a tribunal having full jurisdiction of all civil causes arising within the judicial district.    If the defendant could be justified, under the fourth section of that act, for the alleged trespass charged against him, the same section made it his duty to appear and answer to the judicial summons, and make his defence by plea.

Reported cases, in great numbers and of high authority, support the proposition that a military officer, except when war is flagrant or when the courts are silenced by the exigencies of military rule or martial law, is subject to judicial process for the abuse of his authority or for wrongful acts done outside of his military jurisdiction. *Mortyn* v. *Fabrigas*, 1 Cowp. 161, 175.

Trespass for false imprisonment was brought in that case against the Governor of Minorca, charging that he, the governor, had beat and wounded the defendant, and imprisoned him for

the space of ten months, without reasonable or probable cause Plea, the general issue. Trial in the Common Pleas, and verdict for the plaintiff in the sum of £3,000. Exceptions were filed by the defendant, and he sued out a writ of error and removed the cause into the King's Bench, where Lord Mansfield gave the opinion of the court, all the other judges of the court concurring. He held that trespass would lie for an abuse of power, and he supported the conclusion of the court by stating a case that occurred in early time, while he was at the bar, in which a captain in a train of artillery sued the military governor of Gibraltar, who had confirmed the sentence of a court-martial by which the plaintiff had been tried and sentenced to be whipped. His Lordship brought the action, and he says that the governor was ably defended, and, he added, that nobody ever thought that the action would not lie.

Two other cases were mentioned by that great magistrate, which were tried before him in the circuit, one of which was a suit against a military captain, and the other was a suit against an admiral in the navy, both of which resulted in favor of the plaintiff. Errors were assigned in the principal case, and the report shows that the questions were elaborately argued, and that the judgment of the lower court was unanimously affirmed. *McLaughlin* v. *Green,* 50 Miss. 453–462; *Bellamonte Case,* 2 Salk. 625; *Way* v. *Yally,* 6 Mod. Rep. 195.

Examples of the kind in the courts of the parent country are quite numerous, and in every case the alleged wrong-doer was put to his justification; and if it appeared that the wrongful act was done without lawful authority, the plaintiff recovered compensation for the injury. 1 Smith, Lead. Cas. (7th ed.), par. II. 1035.

Where the captain of a company imposed a fine upon a soldier, and issued a warrant for its collection, under which the soldier was imprisoned, and it appeared that the statute conferred no authority upon the captain to issue warrants for the collection of fines in such cases, it was held, in an action of trespass brought by the soldier against the captain, that the plaintiff was entitled to recover. *Mallory* v. *Bryant,* 17 Conn. 178; 6 Waite, Actions and Defences, 49.

Acts of military officers within the scope of their jurisdiction

are protected, while such as are in excess of their jurisdiction are actionable. Id. 107.

When and where the civil power is suspended, the President has a right to govern by the military forces, but in all other cases the civil power excludes martial law and government by the war power. *Griffin* v. *Wilcox*, 21 Ind. 370; 7 Waite, Actions and Defences, 314.

A soldier cannot justify on the ground that he was obeying the orders of his superior officer, if such orders were illegal and not justified by the rules and usages of war, and such that a person of ordinary intelligence would know that obedience would be illegal and criminal. *Riggs* v. *State*, 3 Cold. (Tenn.) 87; *Wise* v. *Withers*, 3 Cranch, 331, 337; *Commonwealth* v. *Palmer*, 2 Bush (N. Y.), 570.

It follows that the military commander, after the capture of New Orleans, had no right to seize private property as booty, or to confiscate it, for the reason that hostilities had ceased and the courts were open. *Planters' Bank* v. *Union Bank*, 16 Wall. 483; 7 Waite, Actions and Defences, 315.

Without proof of a direct order from the commandant of the place, the defendant cannot justify his acts as having been authorized by his superior officer, even if that would afford a justification; for, as Dr. Lushington said in a celebrated case, if the act which he did was in itself wrongful and produced damage to the plaintiff, he, the plaintiff, must have the same remedy by action against the wrong-doer, whether the act was his own, spontaneous and unauthorized, or whether it were done by the order of the superior power. Agents in such cases are responsible for their tortious acts; but the government is morally bound to give them indemnity, the rule being, as the court held in that case, that "the right to compensation in the party injured is paramount to that consideration." *Rogers* v. *Dutt*, 13 P. C. C. 209, 236; *Wilson* v. *Franklin*, 63 N. C. 259.

It is not to be questioned, said Phelps, J., that, if a military officer transcend the limits of his authority and take cognizance of a matter not within his jurisdiction, his acts are void, and will afford no justification to those who act under him. *Darling* v. *Bowen*, 10 Vt. 148, 151. Conclusive support to that proposition, if any be needed, is found in several Eng-

lish cases of undoubted authority. *Warden* v. *Bailey*, 4 Taunt. 65–87.

During the argument, reference was made to the military order of the 16th of August, 1862, which purported to authorize commanders in certain States to seize property, real and personal, necessary or convenient for their commands or other military purposes; but it is clear that that order had no application in localities within the peaceable possession of the Union forces, for several reasons, either one of which is sufficient to show that it is a mere afterthought: —

1. It could not apply to New Orleans, because if it did it would contradict and supersede the proclamation of General Butler, in which he promised that all the rights of property of whatever kind should be held inviolate.

2. Because it has been solemnly decided by this court that a military commander of that district, after the said proclamation, could not seize private property as booty of war. *Planters' Bank* v. *Union Bank, supra.*

3. Because the record shows that the whole district had been restored to the Union, and that all the inhabitants were in cheerful submission to the Federal Constitution.

4. Because there was no more necessity for seizing private property as supplies than there would have been if the Union forces had been encamped in any one of the great loyal cities of the North.

Concede the correctness of these suggestions, and two conclusions follow: 1. That this court has no jurisdiction to reverse or affirm the judgment of the Circuit Court. 2. That, if this court has such jurisdiction, then the judgment of the Circuit Court should be affirmed.

Attention was not called to the question of jurisdiction in the court below; nor is it probable that the result would have been different if it had been, as the universal practice in the Circuit Court is to favor appeals and render every facility to promote a re-examination of the judgment, unless the right has been denied by some express decision of the Supreme Court, or by some explicit and unambiguous congressional regulation.

MR. JUSTICE MILLER.  Concurring with my brother CLIF-
FORD that this court is without jurisdiction, because the amount
in controversy does not exceed $5,000, I am content to rest that
point on what he has said.

I also believe that the judgment of the Circuit Court should
be affirmed, for a single reason, which I will state in as few
words as possible.

It is apparent that, very soon after the capture of New Or-
leans by our forces, the administration of justice as between
individuals was remitted to the civil courts.  The proclamation
of General Butler shows that it was his purpose that such rights
as required for their determination judicial proceedings should
be asserted in the ordinary tribunals, with as little interruption
and as little interference by the military authority as possible.
Evidence of this is to be found in the fact that, without any
change in the judge, who had taken the oath of allegiance, the
Sixth District Court of New Orleans was continued in the
exercise of all its functions, which, under the proclamation,
included the adjudication of " civil causes between party and
party."  It exercised jurisdiction both by the general law of
Louisiana and the express proclamation of the commanding
general.  The locality was a part of the United States.  The
parties were citizens of the United States.  No active military
operations were then carried on within that city or against it;
and for the very reason that its possession had been perfectly
secured by the loyal forces, the civil courts were restored to
the exercise of their ordinary functions in cases between man
and man, or, as the proclamation expresses it, between party
and party.  The condition, therefore, was very different from
that when military forces invade and occupy a foreign coun-
try, which, before any treaty of peace, or the declaration of any
purpose to annex it to the territory of the conqueror, is held in
armed hostility to its former sovereign, and solely by the strong
hand.  In such a case, submission of the inhabitants can only be
maintained by the military power; and to subject that power
to the jurisdiction of the courts of the subjugated country is to
abdicate all control over it.

But in New Orleans it was far otherwise.  Our military
forces were rightfully there, and in their own country, among

citizens of the United States, subject to the same paramount authority, and owing allegiance to the same government. Those citizens had been only a few months in insurrection, and they were invited to submit themselves again to the same laws, and to have their contested rights decided by the same courts, and, in this case, by the same judge.

In this condition of affairs, Johnson, who was a resident and citizen, against whose loyalty no charge is made, filed in that court his petition, in due form of law, setting forth that certain persons had, with force and violence, committed a trespass on his home, and taken therefrom personal property of the value of several thousand dollars, and charging Dow with being guilty of this trespass.

The usual process of summons was personally served on Dow, and on his failure to appear or answer, either by himself or attorney, a default was entered, and a judgment rendered for the value of the property taken. This judgment remaining in full effect, the plaintiff, to enforce the payment of it, brought the present suit in the Circuit Court of the United States for the District of Maine, where Dow resides.

The defence — the only defence which could be relied on — is the alleged total and absolute want of jurisdiction in the Sixth District Court over the case.

But surely that court did have jurisdiction of an action of trespass. The plaintiff was not only competent to sue, but entitled to a remedy in that court, if the cause of action was such as he declared. It is not denied that the trespasser, had he not been a member of the military forces of the United States, would have been liable to suit, and bound to answer. But it is said that because Dow was an officer of those forces he was not bound to answer.

When a proper plaintiff brings an actionable case before a court which has jurisdiction of it, and due service of process is made, I hold it to be a principle of universal prevalence that the question of the defendant's personal exemption from such process or jurisdiction must, by plea or some other appropriate mode, be brought before the court. I know of no exceptions to this rule, which is laid down by all the works on pleading, from Chitty to the present time. There is no other way in

which the court can know of the exemption if it be not unnecessarily stated in the plaintiff's pleading. The court, as the case stands, has jurisdiction, and must pronounce the judgment of the law. If the party sued deems proper for any reason to stay away or remain silent, he does so at the peril of having a judgment rendered against him which cannot be assailed collaterally.

Much is said of the evil of dragging military officers into the courts under such circumstances. But the military power can make such general orders as will protect itself against an abuse of the right which it has expressly recognized. So, the idea that Dow ought not to have been compelled to leave his post at Fort St. Philip, to defend this suit in New Orleans, is of little force. If he had to be found at the fort for service of process, he could easily have employed a lawyer to put in his plea in abatement that he was acting under military authority, and therefore not liable to the suit.

Every man is liable to be sued wrongfully or without cause, but he is, by the very genius of our laws, bound to submit to this evil and make defence. Why should not this class of men, who of all others possess most despotic power, be required to show the authority by which they exercise it?

If I am not mistaken in these principles, I see no escape from their controlling influence in the case before us. It is too well settled to admit of controversy, that a judgment rendered by a court, having jurisdiction of the parties and the subject-matter of the suit, can only be impeached by some direct proceeding to avoid it, and that when an action on it is brought in any other court, no defence can be interposed which should have been made in the former suit. General Dow could not, therefore, set up in the Circuit Court as a bar to the judgment the same matters that he should have pleaded in the court which rendered, and was bound to render it.

It is impossible in discussing this matter that memory should fail to recall a very famous case of historical interest, involving many of the same principles, which occurred about half a century before this, and of which the same city was the theatre.

During what has been called the siege of New Orleans, at the close of the last war with Great Britain, the commanding

general of our forces declared martial law in that city. This was unpleasant to many citizens, and to others who claimed to be foreigners domiciled there at the time. Some of these becoming restive under its restraints, made publications of a seditious character in the newspapers, for which they were arrested by order of General Jackson. When Judge Hall, of the proper civil court, issued a *habeas corpus* for their release, the general tore up the writ and sent the judge by force beyond his lines. Within a very few days after this, the victory of the 8th of January, 1815, was achieved, and on the receipt of the news of the treaty of peace the declaration of martial law was revoked. Judge Hall, on resuming his judicial functions, issued a process against General Jackson for contempt of court in his action in reference to the writ of *habeas corpus*.

That distinguished man, though in the midst of the adulation consequent on the great victory, did not act as the defendant in this case did, by paying no attention to the process, but came to the court in citizen's dress, attended only by a single member of his military family and with his legal adviser. He offered to read the same paper which his counsel had read against issuing the process for contempt, and, when the court declined to hear it, submitted himself to its judgment. At this there was such a demonstration of ill-feeling in the crowded court-room that the judge said he could not proceed, and would adjourn the court. But the noble defender of the city declared that he was equally ready to defend the court, and begged that the judge would proceed without fear to do what he might think his duty required. A fine of $1,000 was entered up against the general, which he paid at once, and used his authority, which was needed, to disperse the mob, who were inclined to violence against the judge.

I confess I have always been taught to believe that Judge Hall was right in imposing the fine, and that General Jackson earned the brightest page in his history by paying it, and gracefully submitting to the judicial power. Such I believe is the judgment of history and of thoughtful judicial inquirers; though a grateful country very properly refunded to her favorite general the sum he had paid for a necessary but unauthorized exercise of military power. I have no doubt that General

Dow had good reasons for all he did, and I think he would have acted more wisely if, respecting the courts in the proper exercise of their functions, he had made his defence at the right time before the appropriate tribunal.